**In re Application for Immunity of John P. CALANDRA.**

**No. CR 71-300.**

United States District Court, N. D. Ohio, E. D.

Oct. 1, 1971.

Robert Gary, Steven R. Olah, Cleveland, Ohio, Organized Crime Strike Force, for Government.

Gerald S. Gold, Robert Rotatori, Cleveland, Ohio, for Calandra.

BATTISTI, Chief Judge.

On August 17, 1971, John Calandra appeared before a Federal Grand Jury. On the same day the United States Attorney requested that John Calandra be granted immunity pursuant to Title 18, Section 2514 of the United States Code. Prior to the granting of the immunity, Calandra filed a "request for postponement of hearing on application for immunity order" in order that he might move to suppress certain evidence which he claims to have been seized in violation of the requirements of the Fourth Amendment. Calandra alleges, and the Government acknowledges, that the questions put to Calandra before the Grand Jury were based upon this evidence. The Government wishes to immunize Calandra and he has stipulated that he will refuse to answer any questions before the Grand Jury. The questions presented in this motion are whether a district court may consider a motion to suppress in a proceeding ancillary to a grand jury hearing and, if so, whether the evidence upon which the questions were based was illegally seized either because the affidavit for the search warrant did not allege probable cause for a search of the Royal Machine and Tool Company, or because the search of the Royal Machine and Tool Company was too broad in that it went beyond the allowable limits prescribed by the search warrant and the strictures of the Fourth Amendment.

I. *The Propriety of the Hearing.*

In a recent case, In the Matter of Egan, 450 F.2d 199 (3d Cir. 1971), the Third Circuit *en banc* examined a similar but not so far reaching set of facts. Sister Joques Egan, an alleged co-conspirator, but not a co-defendant in an indictment returned in the Middle District of Pennsylvania, was called before a federal grand jury and refused to testify because, among other grounds, "the information which caused the Government to subpoena her and which prompted the questions propounded to her flowed from illegal wire tapping and electronic surveillance." 450 F.2d at 201. She was subsequently held in contempt. The Third Circuit, with which this Court concurs, held the District Court was required to hold a hearing as to the alleged violation of Sister Egan's Fourth Amendment rights because it was required by 18 U.S.C. § 2518(10), 18 U.S.C. § 2515, and the Fourth Amendment itself. In the instant case, Calandra is raising a much broader issue. He seeks to extend the narrow holding of the Third Circuit to the limit of the Fourth Amendment thus necessitating the Court's ruling upon any Fourth Amendment violation which becomes relevant within the context of the Grand Jury's examination.

The Government contends that "it is settled law that motions to suppress are not entertained in the context of a grand jury proceeding." It seems, however, that this is not settled law, that in fact it is the subject of considerable controversy. (Compare In the Matter of Egan, 450 F.2d 199 [3d Cir. 1971] and United States v. Gelbard [United States v. Parnas, 443 F.2d 837 [9th Cir. 1971]. See Greenspan and White, Standing to Object to Search and Seizure, 118 U.Pa.L. Rev. 333 (1970). It is the position of the Government that this motion is premature because it is being considered prior to the grant of immunity rather

than in connection with a contempt hearing. This Court cannot agree. It has been stipulated that the Government intends to immunize Calandra and that Calandra intends not to answer its questions even at the risk of a contempt citation. Thus, in substance, the situation is in the same posture as it would be in connection with a contempt hearing. The scope of review is no larger here than it would be after Calandra had gone through the revolving door which would bring him back here raising the same issues in a defense to a contempt citation. The fact that he is not in jail is not significant, because he, like Sister Egan, would be allowed reasonable bail pending this hearing and any appeal.

The thrust of the Government's position is that Calandra has no standing to raise search and seizure question as a witness before a grand jury. The standard for determining whether an individual possesses the requisite standing, as the Supreme Court stated, " * * * concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Normally when an illegal search and seizure has been directed against a citizen, he has standing to complain of the Fourth Amendment violation. "The fact that the question of standing arises in a grand jury investigation does not alter the result." In the Matter of Egan, 450 F.2d at 210.[1] The Government urges that since the witness will never reach the status of defendant, he is in no jeopardy and therefore he may not raise his Fourth Amendment claim. See Carter v. United States, 417 F.2d 384 (9th Cir.

1969), cert. den. 399 U.S. 935, 90 S.Ct. 2253, 26 L.Ed.2d 807 (1970). See also Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919). This argument is buttressed by the language of In re Shead, 302 F.Supp. 569 at 571 (N.D.Cal.1969).

"The constitutionally exclusionary rule of illegally-obtained evidence is based on the necessity for an effective deterrent to illegal police action. * * * The risk of not being able to achieve conviction serves this purpose. It is a truism that the deterrent is strengthened by extending the exclusionary rule to grand jury proceedings while they are in progress. *However, this would be an unduly burdensome restriction on the administration of justice.*"

Since the question of standing seems to be a "non-issue," to quote the words of dissenting Judge Gibbons in *Egan,* 450 F.2d at 224, the issue of the restriction on the administration of justice stands alone at the core of the argument of the United States. The Government relies heavily on the dissenting opinion in *Egan.* Instead of repeating the careful analysis of the Fourth Amendment question in the opinion of the Third Circuit, an examination of that dissenting opinion seems in order.

The dissenting opinion agrees with the prevalent view of the Ninth Circuit, Carter v. United States, *supra,* and the Second Circuit, United States ex rel. Rosado v. Flood, 394 F.2d 139 (2d Cir. 1968) that the protections of the Fourth Amendment do not extend to a witness before the grand jury. Judge Gibbons objects to what he classifies as an unqualified witness privilege, which he contends the majority of the Third Circuit has created in the place of a limited exclusionary rule of evidence which operates on behalf of defendants in criminal proceedings. To prove his point, Judge

---

[1]. There was no disagreement on the point in *Egan.* Dissenting Judge Gibbons stated " * * * [I]t is perfectly clear that a witness can create a case or controversy to test the existence of a witness privilege by standing in contempt of an order to testify. * * * Moreover it makes no difference that the witness asserts his privilege in a grand jury proceeding." 450 F.2d at 224.

Gibbons hypothesized an example. Suppose A's telephone is unlawfully tapped and further suppose that through this unlawful electronic surveillance the Government learns that A has information helpful to the defense of B, someone under indictment. If the Government discloses to B that A would be a helpful witness, A may nevertheless refuse to testify. The fact that A will not so refuse is not considered by Judge Gibbons. However, assuming that A does refuse to testify, what has the Government lost that will not be corrected next time when a lawful electronic surveillance is in operation? Consider the alternative. If a witness may not raise the Fourth Amendment claim at this time, what is to force the Government to obtain search warrants or wire tap warrants whenever it wants evidence for a grand jury investigation. Suppose A has evidence in his possession that would incriminate B. A is involved in an illegal operation with B, but B is a much more important figure in the organization supervising this illegal activity. Agents of the Government without a warrant enter A's business and examine every cubic foot of it. After this thorough search in which certain evidence is found, A is then called to testify before the grand jury and is immunized. His only defense to this violation of his privacy is a term in jail for civil contempt. He may, of course, testify and incriminate B and ignore the invasion of his privacy.[2] Certainly if these are the only alternatives, as they seem to be, the sanctity of the Fourth Amendment protections will win out against the efficient administration of the grand jury. Judge Gibbons disagrees.

> "The witness' privacy yields to a paramount public interest even though his testimony may subject him to enmity, ridicule, danger or disgrace. That paramount public interest outweighs considerations of witness privacy because the whole life of the community

depends upon how well the institutions of justice perform their role of social lubricator." 450 F.2d at 222.

Judge Gibbons fails to include in his equation the fact that if the Government is allowed to violate a person's privacy only when it has the requisite probable cause, he will have the needs of the grand jury satisfied without being subject to the criticism that the Fourth Amendment is suspended in the context of a grand jury investigation.

Judge Gibbons next characterizes the rights of the witness as third party rights and then states that the litigants and the judicial process, rather than the wrongdoer, are the victims of the delay that results from the adjudication of those rights. Judge Gibbons rests his position, as does the Government, in the case at bar, on the delay that will be caused by the adjudication of third-party rights. The majority opinion in *Egan* attempted to minimize the potential effect on the judicial process as a whole by saying:

> "We assume that the Government will attempt to conduct surveillance within statutory and constitutional limits, and that only in a slight number of cases will there be a violation of the rules governing wiretapping." 450 F.2d at 216.

There is no argument that the slight number of cases involving wire tapping is a smaller number than those involving the Fourth Amendment generally; yet, although there is no empirical evidence on either side, it seems that the possibility that some grand jury witnesses may seek hearings is not sufficient to cause a curtailment of Fourth Amendment rights. It would seem that, in the absence of empirical evidence, there would be almost a conclusive presumption in favor of the protections provided by the Constitution.

The question of delay explicit in the opinion of Judge Gibbons is one of some

---

2. The Court notes that the defendant can sue the Government for damages or file a motion to return the seized evidence. However, both of these are inadequate. See infra pp. 741, 742.

depth. Delay, as used in the context of judicial proceedings, does not mean merely those situations in which a trial or a proceeding ancillary to a trial takes longer than it should as compared to some ideal or textbook model. The term delay means that time during which a case is allowed to lie unresolved when there is no justifiable reason not to dispose of the lawsuit. Delay means avoidable delay. The presence of a simple personal injury case on a court's docket for three years is more likely than not an example of avoidable delay. It is not unusual for an antitrust case to be on the docket for three years or longer before discovery is completed. This is not delay. This is merely a long period of time which must elapse in order for the parties to adequately prepare themselves for the trial of this kind of a complex case. Time properly consumed in the trial of a complex case, or analyses of complex or difficult issues, or in holding a hearing to examine whether one's constitutionally protected rights have been violated is not delay, as that term is used in the context of the courts. The issue implicit in the question of delay is whether the examination of third-party rights as they arise in the context of alleged bad conduct on the part of the Government is by definition dilatory, or avoidable delay. Judge Gibbons and the Government in the case at bar seem to be insisting that it is. This Court can not agree. The judicial system is designed to protect the Bill of Rights, not to cast it aside in a mad rush toward the goal of judicial efficiency. Any examination of a potential infringement of those rights can, under no circumstances, be considered avoidable delay. The reports cite numerous examples where courts have "delayed" the ultimate resolution of a case so that constitutional objections could be heard at a fair hearing and a reliable determination could be reached. See e. g. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1962). Therefore, the fear raised by Judge Gibbons in *Egan* and by the United States in the instant case that the adjudication of third party constitutional claims will unduly delay the grand jury proceedings in particular and the operation of the criminal process in general must be respectfully rejected.

Calandra does have other remedies. He could move to return the evidence after the conclusion of the grand jury investigation or he could sue the Government for damages. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In *Bivens,* the Supreme Court held that the mere suppression of evidence is not sufficient to correct the violation of one's privacy by agents performing a warrantless search. It held that the Fourth Amendment also authorizes a suit for damages recoverable upon proof of injuries resulting from federal agents' violation of that Amendment. If suppression alone is not sufficient then how could money alone be an adequate remedy? Therefore, neither the motion to return nor a suit for damages can be held to be an adequate protection of one's Fourth Amendment rights. It is just as inadequate to be informed that one will not be prosecuted for governmental misconduct as it is to say that years later the United States may monetarily reimburse one for its violations of his privacy. Money damages do not constitute complete restitution for the infringement of constitutional rights. The remainder of the dissenting opinion deals with Section 2515 of Title 18 of the United States Code and its legislative history, which is not here relevant. The opinion near its conclusion states:

"* * * The courts started with the premise that an exclusionary rule of evidence would deter future unlawful police conduct. That premise had no empirical foundation. * * *"

Judge Gibbons rests much of his opinion on the lack of existing empirical evidence to support the decision of the majority of his court in *Egan* and constitutional decisions generally. If courts were re-

quired to rely on empiricism alone in such matters, mathematicians and philosophers rather than lawyers and judges would be involved in the trial of lawsuits. The words of Mr. Justice Day in Weeks v. United States, 232 U.S. 383, 391–393, 34 S.Ct. 341, 58 L.Ed 652 (1914) cited by the majority seems more to the point:

> "The effect of the 4th Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects, against all unreasonable searches and seizures under the guise of law."

> \*   \*   \*   \*   \*   \*

> "If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to be secure against such searches and seizures, is of no value, and so far as those thus placed are concerned, might well be stricken from the Constitution. \* \* \*" 450 F.2d at 217.

As Justice Brandeis stated in dissent In Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):

> "In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a law breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal— would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

█ This Court holds that there is a requirement of due process which allows a witness to litigate the question of whether the evidence which constitutes the basis for the questions asked of him before the grand jury has been obtained in a way which violates the constitutional protection against unlawful search and seizure. See In re Evans, (D.C.Cir.1971).

II. *Probable Cause for the Search Warrant.*

The affidavit in support of the application for the search warrant for Royal Machine and Tool Company [3] contained information derived from three separate sources: (1) court authorized electronic surveillance, (2) physical surveillance conducted by members of the Federal Bureau of Investigation, and (3) information supplied to the Federal Bureau of Investigation by confidential informants.

█ During the course of the lawful electronic surveillance, John Calandra was identified by name and telephone number during numerous conversations with one Joseph Lanese, a purported gambler and bookmaker. Many of these phone conversations were gambling related, but none involved the use of the phone at Royal Machine and Tool. Rather, they were made from or to Calandra's home phone. Calandra admits to these conversations, but claims that he was merely a bettor and not part of any gambling operation. The only evidence which the Government offered in support of its conclusion that Calandra was involved in a gambling operation was that on November 15, 1970, in the height of the football season, Lanese and Calandra had a conversation during which they discussed their bets on seven games. Later that same day, during another con-

---

3. The Government had obtained three warrants, one for Calandra's home, one for a car, and one for his business. The evidence presented in support of all three warrants was the same. We are concerned here only with the search of the Royal Machine and Tool Company.

743

versation made from and to phones not in any way related to Royal Machine and Tool, Lanese told Calandra to "add Detroit," and that the point spread was eight. Even assuming that these calls were made from and to Royal Machine and Tool, it would be difficult to find probable cause based on these phone calls. See generally, Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). However, they were not. The phone calls were made to and from Calandra's home. The affiant's own conclusion about these telephone calls was that they "disclosed a betting relationship between Lanese and Calandra," but even the affiant could not conclude that Calandra was a bookmaker. The Supreme Court has recently held in Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971) that 18 U.S.C. § 1952 does not make it a federal crime to cross a state line for the purpose of placing a bet. There seems to be no difference between patronizing a betting establishment by appearing in person and using the telephone. Compare Rewis, supra, and United States v. Chambers, 382 F.2d 910 (6th Cir. 1967). From the evidence he presented in the affidavit as it relates to the phone conversation between Lanese and Calandra, it appears that the affiant observed mere betting. However, since none of these calls in any way involved the phone at Royal Machine and Tool, this evidence has no probative value in establishing probable cause to search Calandra's business at Royal Machine and Tool for gambling paraphernalia.

In addition to the conversations overheard, physical surveillance by members of the F.B.I. placed Lanese at the Royal Machine and Tool Company, and an automobile registered to Royal Machine and Tool was seen at Joseph Lanese's residence.

On November 13, 1970, Lanese's 1969 automobile was surveilled to the Royal Machine and Tool Company. This allegation alone cannot support a claim of probable cause to believe that Royal Machine and Tool was a front for a gambling operation. In the words of Spi-

nelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), this visit reflects nothing more than "innocent seeming activity and data. * * * [which] could hardly be taken as bespeaking gambling activity." 393 U.S. at 414, 89 S.Ct. at 588. Spinelli's automobile was observed parked in the apartment house lot four out of five days of his surveillance. This was found by the Supreme Court to be insufficient cause for the issuance of the warrant. If four observations were insufficient, one visit must certainly be insufficient. In addition, the warrant did not allege the purpose of the visit nor did it allege that Lanese saw or spoke with anyone. Other than the fact that Lanese's car was observed in front of Royal Machine and Tool, there is no reference to any communication or connection between Lanese and Royal Machine and Tool. This is not sufficient for probable cause.

On November 16, 1970, according to the affidavit, a Pontiac registered to Royal Machine and Tool was observed parked in front of the residence of Joseph Lanese. Shortly after this "observation" Lanese telephoned the Fai-Com Club and advised the other party to the conversation that he, Lanese, and "Johnny" were coming to the club. The F.B.I. then observed both the Pontiac and Lanese's automobile in the vicinity of the Fai-Com Club. The affidavit does not allege that Calandra was operating the Pontiac. The mere fact that the Pontiac was registered to the Royal Machine and Tool Company does not mean that the company authorized its use or that the car was being used for any illegal purpose. To extend Lanese's "taint of evil" to the Pontiac and then to Royal Machine and Tool is stretching it much too far. The affidavit does not specify anything which would indicate that any illegal activity went on between the driver of the Pontiac and Lanese, and he specifies nothing that would in any way indicate that any illegal activity was being engaged in at Royal Machine and Tool. The affidavit reveals neither the identity nor the description of the driver, does not state whether he was in any way

related to Royal Machine and Tool, that the driver was observed entering or leaving Lanese's residence, that the driver was observed en route to the Fai-Com Club, nor that the driver was seen entering the Fai-Com Club. This is not sufficient to establish the existence of probable cause for the existence of a warrant to search Royal Machine and Tool.

■ The affiant declares that on December 4, 1970, an informant advised him that as of that date Calandra would accept and lay off wagers and that defendant used his home and his office for an alleged bookmaking operation. This informant is said to be reliable, and as having made wagers and of personally knowing others who have made wagers with Lanese. *Spinelli, supra,* and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) require that an application for a search warrant set forth the underlying circumstances from which the informant drew his conclusions so as to enable the magistrate independently to judge the informant's conclusion that the accused was indeed running a bookmaking operation. No such "underlying circumstances" are here present. The affidavit in fact does not allege that the informant, the affiant or anyone known to him personally has ever placed a bet with Calandra, or observed him taking a bet, or in fact that he ever visited Calandra's home or office. An alternative is offered in *Spinelli* to the requirement of "underlying circumstances":

> "In the absence of a statement detailing the manner in which the information was gathered it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld, or an accusation based merely on an individual's general reputation." 393 U.S. at 417, 89 S.Ct. at 589.

In *Spinelli* the informant asserted that the accused used two particular telephone numbers for bookmaking. The Supreme Court found this to be insufficient. There is less presented here.

There is no attempt made in this opinion to retreat from the proposition that the standard of probable cause is a probability of criminal activity and not a prima facie showing, Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), or that magistrates should be confined to "niggardly limitations or restrictions on their common sense." United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). However, the record seems to indicate that probable cause did not exist for the issuance of the warrant. See United States v. Price, 149 F.Supp. 707 (D.C.D.C.1957); United States ex rel. DeNegris v. Menser, 247 F.Supp. 826 (D.C.1965). No fact taken independently nor their sum total establish that the United States had probable cause to search Royal Machine and Tool for gambling paraphernalia.

### III. *The Extent of the Search.*

Assuming, arguendo, that the search warrant was validly issued, there is a question raised as to whether the search of Royal Machine and Tool went beyond the scope of the warrant and beyond the bounds permissible under the Fourth Amendment.

The warrant in question authorized agents to seize " * * * bookmaking records and wagering paraphernalia consisting of but not limited to betting slips, cash, bet notices and books of records which are intended for uses in violation of Sections 371, 1084, and 1952 of Title 18, USC." The Fourth Amendment requires that the warrant shall "particularly describe the place to be searched, and the persons or things to be seized." Berger v. New York, 388 U.S. 41, 58, 87 S.Ct. 1873, 1883, 18 L.Ed. 2d 1040 (1967). This is to make general searches impossible. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). The items seized from Royal Machine and Tool were evidence of an alleged shylocking operation and not of a gambling operation. There are exceptions to the strict

*Marron* rule, and the question before the Court is whether the evidence of the alleged shylocking operation fits into one of these exceptions.

It is well established by now that fruits of a crime, instrumentalities of a crime, contraband and mere evidence may be seized in a lawful search. See Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Evidence may be seized under one of these exceptions only when the items seized bear a reasonable relationship to the purpose of the search.

> "There must be, of course, a nexus— automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus, in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." 387 U.S. at 307, 87 S.Ct. at 1650.

As the Sixth Circuit stated in United States v. Eisner, 297 F.2d 595, 597 (6th Cir. 1962) " * * * Where an officer is proceeding lawfully, making a valid search, and comes upon another crime being committed in his presence, he is entitled to seize the fruits thereof. * * * " *Eisner* dealt with the seizure of furs stolen at another time and place, but within the plain view of the officers upon their search of Eisner's automobile. The furs in the car were not listed in the search warrant, but the Sixth Circuit held that nonetheless they could be lawfully seized. See Aron v. United States, 382 F.2d 965 (8th Cir. 1967).

The question of the parameters of the "plain view" doctrine was discussed by the Supreme Court in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The Court reaffirmed its view that the police may seize evidence in plain view without a warrant, so long as they had a valid justification for their original intru-

sion. The Court stated its view of the limits of such a search:

> "Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." Id. 91 S.Ct. at 2038 (1971).

Stanley v. Georgia, 394 U.S. 557, 569, 89 S.Ct. 1243, 22 L.Ed.2d 542 (Stewart, J. concurring) provides a concrete example of this rule. The search in *Stanley* was directed at bookmaking paraphernalia, but after a thorough search of Stanley's home the agents discovered only some allegedly obscene films which they seized. The criminal nature of this evidence was not plainly apparent. Rather, the officers had to exhibit them by means of a projector found in another room. This the concurring judges found to be an unlawful search and seizure.[4]

The items seized here in the thorough search of the offices and plant of the Royal Machine and Tool were stock certificates and other records and forms. Not until a locked file drawer in the offices of Royal Machine and Tool was opened were the items in "plain view," and only after carefully examining each and every item in this drawer could the agents determine that they may be evidence of a criminal activity. This case is too close to that of *Stanley* for this Court to depart from its teaching.

■■ However, the search warrant countenanced a general search and as such is invalid. Royal Machine and Tool occupies a two-story building. The first floor housing a working area consists of approximately 13,000 square feet. The second floor contains a general office area of about 1,500 square feet and a small office occupied by Calandra and his secretary. In a four-hour search, agents searched literally the entire prem-

---

4. The majority in *Stanley* decided the case on First Amendment grounds.

ise including tool boxes, lunch bags, desks of four employees, numerous filing cabinets, and a complete search of Calandra's inner office. This type of operation is closer to ransacking than a careful search for particularly described items. The affidavit does not state where within the building Calandra kept evidence of the crime of bookmaking, even as to whether it was kept in the working area or in Calandra's office. In United States v. Hinton, 219 F.2d 324 (7th Cir. 1955), the affidavit alleged sale of heroin by certain occupants in an apartment building, but the search warrant authorized a search of the entire building. The Seventh Circuit held the warrant to be void despite the Court's finding that there was probable cause to search the apartments of four residents. Mancusi v. DeForte, 392 U.S. 364, 367, 88 S.Ct. 2120, 20 L.Ed.2d 1154 notes that the word "houses" extends to "commercial premises." See e. g. See v. Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1932); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1919). A search warrant for either an apartment house or a commercial establishment is not sufficient if it merely alleges the address and describes the building generally. It must state with some specificity where in the building the agents expect to find the particular items listed in the warrant. See Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1964).

The United States claims that they were aware or had reason to believe that Calandra was operating a shylocking operation. They contend that when they came upon the evidence in question their belief was confirmed. They also admit that on December 11, 1970, they did not possess sufficient evidence to establish probable cause for the issuance of a warrant to search for loan-sharking records at Royal Machine and Tool (18 U.S.C. §§ 892 and 894). This simply will not do. Searches may not be justified after the fact. It seems that the Government

was really searching for evidence of a shylocking operation under the guise of a search warrant for bookmaking paraphernalia. Assuming that Calandra is involved in the shylocking business, it is unlikely that evidence of his illegal activity would vanish by the time the United States had obtained sufficient evidence to establish probable cause to search Calandra's office for evidence of a shylocking operation. Then the Government could accomplish its desired result without attempting to stretch the plain view doctrine out of shape.

As the Government notes in its brief, there are no set or absolute standards or guidelines for a reasonable search; and each search must be resolved under the circumstances involved. The constitutional concept of reasonableness or unreasonableness must be imposed on the facts existing in each case. Based on the circumstances here presented, this search is deemed to be beyond the scope of the search warrant and the warrant is held to be not based upon probable cause. The evidence seized is suppressed. Calandra need not answer any questions before the Grand Jury that are based on this evidence. The evidence seized is to be returned to Calandra forthwith.

It is so ordered.