# UNITED STATES *v.* CALANDRA

No. 72–734. Argued October 11, 1973—Decided January 8, 1974

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, and Rehnquist, JJ., joined. Brennan, J., filed a dissenting opinion, in which Douglas and Marshall, JJ., joined, *post*, p. 356.

*Louis F. Claiborne* argued the cause for the United States. With him on the briefs were *Solicitor General Bork,* former *Solicitor General Griswold, Assistant Attorney General Petersen, Deputy Solicitor General Lacovara, Keith A. Jones, Jerome M. Feit,* and *Shirley Baccus-Lobel.*

*Robert J. Rotatori* argued the cause for respondent. With him on the brief were *Gerald S. Gold* and *Niki Z. Schwartz.* *

Mr. Justice Powell delivered the opinion of the Court.

This case presents the question whether a witness summoned to appear and testify before a grand jury may refuse to answer questions on the ground that they are based on evidence obtained from an unlawful search and seizure. The issue is of considerable importance to the administration of criminal justice.

---

*Melvin L. Wulf* and *Paul Halvonik* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

## I

On December 11, 1970, federal agents obtained a warrant authorizing a search of respondent John Calandra's place of business, the Royal Machine & Tool Co. in Cleveland, Ohio. The warrant was issued in connection with an extensive investigation of suspected illegal gambling operations. It specified that ·the object of the search was the discovery and seizure of book-making records and wagering paraphernalia. A master affidavit submitted in support of the application for the warrant contained information derived from statements by confidential informants to the Federal Bureau of Investigation (FBI), from physical surveillance conducted by FBI agents, and from court-authorized electronic surveillance.[1]

The Royal Machine & Tool Co. occupies a two-story building. The first floor consists of about 13,000 square feet, and houses industrial machinery and inventory. The second floor contains a general office area of about 1,500 square feet and a small office occupied by Calandra, president of the company, and his secretary. On December 15, 1970, federal agents executed the warrant directed at Calandra's place of business and conducted a thorough, four-hour search of the premises. The record reveals that the agents spent more than three hours searching Calandra's office and files.

Although the agents found no gambling paraphernalia, one discovered, among certain promissory notes, a card indicating that Dr. Walter Loveland had been making periodic payments to Calandra. The agent stated in an affidavit that he was aware that the United States Attor-

---

[1] On the basis of the same affidavit, federal agents also obtained warrants authorizing searches of Calandra's residence and automobile. The present case involves only the search of the Royal Machine & Tool Co.

ney's office for the Northern District of Ohio was investigating possible violations of 18 U. S. C. §§ 892, 893, and 894, dealing with extortionate credit transactions, and that Dr. Loveland had been the victim of a "loansharking" enterprise then under investigation. The agent concluded that the card bearing Dr. Loveland's name was a loansharking record and therefore had it seized along with various other items, including books and records of the company, stock certificates, and address books.

On March 1, 1971, a special grand jury was convened in the Northern District of Ohio to investigate possible loansharking activities in violation of federal laws. The grand jury subpoenaed Calandra in order to ask him questions based on the evidence seized during the search of his place of business on December 15, 1970. Calandra appeared before the grand jury on August 17, 1971, but refused to testify, invoking his Fifth Amendment privilege against self-incrimination. The Government then requested the District Court to grant Calandra transactional immunity pursuant to 18 U. S. C. § 2514. Calandra requested and received a postponement of the hearing on the Government's application for the immunity order so that he could prepare a motion to suppress the evidence seized in the search.

Calandra later moved pursuant to Fed. Rule Crim. Proc. 41 (e) for suppression and return of the seized evidence on the grounds that the affidavit supporting the warrant was insufficient and that the search exceeded the scope of the warrant. On August 27, the District Court held a hearing at which Calandra stipulated that he would refuse to answer questions based on the seized materials. On October 1, the District Court entered its judgment ordering the evidence suppressed and returned to Calandra and further ordering that Calandra need not answer any of the grand jury's questions based on the

suppressed evidence. 332 F. Supp. 737 (1971). The court held that "due process . . . allows a witness to litigate the question of whether the evidence which constitutes the basis for the questions asked of him before the grand jury has been obtained in a way which violates the constitutional protection against unlawful search and seizure." *Id.,* at 742. The court found that the search warrant had been issued without probable cause and that the search had exceeded the scope of the warrant.

The Court of Appeals for the Sixth Circuit affirmed, holding that the District Court had properly entertained the suppression motion and that the exclusionary rule may be invoked by a witness before the grand jury to bar questioning based on evidence obtained in an unlawful search and seizure.[2] 465 F. 2d 1218 (1972). The offer to grant Calandra immunity was deemed irrelevant. *Id.,* at 1221.

We granted the Government's petition for certiorari, 410 U. S. 925 (1973). We now reverse.

## II

The institution of the grand jury is deeply rooted in Anglo-American history.[3] In England, the grand jury

---

[2] The Court of Appeals affirmed the District Court's finding that the search of Calandra's business and seizure of his property were unlawful. 465 F. 2d 1218, 1226 n. 5. Although the Government does not agree with the court's finding, it has not sought review of this issue. In addition, the Government has not challenged the District Court's order directing return of the illegally seized property to Calandra.

[3] For a discussion of the history and role of the grand jury, see *Costello* v. *United States,* 350 U. S. 359, 361–362 (1956); *Blair* v. *United States,* 250 U. S. 273, 279–283 (1919); *Hale* v. *Henkel,* 201 U. S. 43, 59 (1906); 4 W. Blackstone, Commentaries *301 *et seq.;* G. Edwards, The Grand Jury 1–44 (1906); 1 F. Pollock & F. Maitland, History of English Law 151 (2d ed. 1909); 1 W. Holdsworth, History of English Law 321–323 (7th rev. ed. 1956).

served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. In this country the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by "a presentment or indictment of a Grand Jury." Cf. *Costello* v. *United States*, 350 U. S. 359, 361–362 (1956). The grand jury's historic functions survive to this day. Its responsibilities continue to include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions. *Branzburg* v. *Hayes,* 408 U. S. 665, 686–687 (1972).

Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry. The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials. "It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." *Blair* v. *United States,* 250 U. S. 273, 282 (1919).

The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement. A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an *ex parte* investigation to determine

whether a crime has been committed and whether criminal proceedings should be instituted against any person. The grand jury's investigative power must be broad if its public responsibility is adequately to be discharged. *Branzburg* v. *Hayes, supra,* at 700; *Costello* v. *United States, supra,* at 364.

In *Branzburg,* the Court had occasion to reaffirm the importance of the grand jury's role:

> "[T]he investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen . . . ." 408 U. S., at 700.
>
> "The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it. . . . 'When the grand jury is performing its investigatory function into a general problem area . . . society's interest is best served by a thorough and extensive investigation.' *Wood* v. *Georgia,* 370 U. S. 375, 392 (1962). A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.' *United States* v. *Stone,* 429 F. 2d 138, 140 (CA2 1970). Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. *Costello* v. *United States,* 350 U. S., at 362. It is only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made . . . ." *Id.,* at 701–702.

The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected

by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence, *Costello* v. *United States, supra; Holt* v. *United States,* 218 U. S. 245 (1910); or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination, *Lawn* v. *United States,* 355 U. S. 339 (1958).

The power of a federal court to compel persons to appear and testify before a grand jury is also firmly established. *Kastigar* v. *United States,* 406 U. S. 441 (1972). The duty to testify has long been recognized as a basic obligation that every citizen owes his Government. *Blackmer* v. *United States,* 284 U. S. 421, 438 (1932); *United States* v. *Bryan,* 339 U. S. 323, 331 (1950). In *Branzburg* v. *Hayes, supra,* at 682 and 688, the Court noted that "[c]itizens generally are not constitutionally immune from grand jury subpoenas . . ." and that "the longstanding principle that 'the public . . . has a right to every man's evidence' . . . is particularly applicable to grand jury proceedings." The duty to testify may on occasion be burdensome and even embarrassing. It may cause injury to a witness' social and economic status. Yet the duty to testify has been regarded as "so necessary to the administration of justice" that the witness' personal interest in privacy must yield to the public's overriding interest in full disclosure. *Blair* v. *United States,* 250 U. S., at 281. Furthermore, a witness may not interfere with the course of the grand jury's inquiry. He "is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise, for this is no concern of his." *Id.,* at 282. Nor is he entitled "to challenge the authority of the court or of the grand jury" or "to set limits to the investigation that the grand jury may conduct." *Ibid.*

Of course, the grand jury's subpoena power is not unlimited.[4] It may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law. *Branzburg* v. *Hayes, supra; United States* v. *Bryan, supra; Blackmer* v. *United States, supra;* 8 J. Wigmore, Evidence §§ 2290–2391 (McNaughton rev. ed. 1961). Although, for example, an indictment based on evidence obtained in violation of a defendant's Fifth Amendment privilege is nevertheless valid, *Lawn* v. *United States, supra,* the grand jury may not force a witness to answer questions in violation of that constitutional guarantee. Rather, the grand jury may override a Fifth Amendment claim only if the witness is granted immunity co-extensive with the privilege against self-incrimination. *Kastigar* v. *United States, supra.* Similarly, a grand jury may not compel a person to produce books and papers that would incriminate him. *Boyd* v. *United States,* 116 U. S. 616, 633–635 (1886). Cf. *Couch* v. *United States,* 409 U. S. 322 (1973). The grand jury is also without power to invade a legitimate privacy interest protected by the Fourth Amendment. A grand jury's subpoena *duces tecum* will be disallowed if it is "far too sweeping in its terms to be regarded as reasonable" under the Fourth Amendment. *Hale* v. *Henkel,* 201 U. S. 43, 76 (1906). Judicial supervision is properly exercised in such cases to prevent the wrong before it occurs.

---

[4] The grand jury is subject to the court's supervision in several respects. See *Brown* v. *United States,* 359 U. S. 41, 49 (1959); Fed. Rules Crim. Proc. 6 and 17; 1 L. Orfield, Criminal Procedure Under the Federal Rules § 6:108, pp. 475–477 (1966). In particular, the grand jury must rely on the court to compel production of books, papers, documents, and the testimony of witnesses, and the court may quash or modify a subpoena on motion if compliance would be "unreasonable or oppressive." Fed. Rule Crim. Proc. 17 (c).

## III

In the instant case, the Court of Appeals held that the exclusionary rule of the Fourth Amendment limits the grand jury's power to compel a witness to answer questions based on evidence obtained from a prior unlawful search and seizure. The exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure. *Weeks* v. *United States,* 232 U. S. 383 (1914); *Mapp* v. *Ohio,* 367 U. S. 643 (1961). This prohibition applies as well to the fruits of the illegally seized evidence. *Wong Sun* v. *United States,* 371 U. S. 471 (1963); *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920).

The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim:

> "[T]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late." *Linkletter* v. *Walker,* 381 U. S. 618, 637 (1965).

Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures:

> "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins* v. *United States,* 364 U. S. 206, 217 (1960).

Accord, *Mapp* v. *Ohio, supra,* at 656; *Tehan* v. *Shott,* 382 U. S. 406, 416 (1966); *Terry* v. *Ohio,* 392 U. S. 1, 29 (1968). In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.[5]

Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served. The balancing process implicit in this approach is expressed in the contours of the standing requirement. Thus, standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search. *Brown* v. *United States,* 411 U. S. 223 (1973); *Alderman* v. *United States,* 394 U. S. 165 (1969); *Wong Sun* v. *United States, supra; Jones* v. *United States,* 362 U. S. 257 (1960). This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search.[6]

---

[5] There is some disagreement as to the practical efficacy of the exclusionary rule, and as the Court noted in *Elkins* v. *United States,* 364 U. S. 206, 218 (1960), relevant "[e]mpirical statistics are not available." Cf. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665 (1970). We have no occasion in the present case to consider the extent of the rule's efficacy in criminal trials.

[6] In holding that the respondent had standing to invoke the exclusionary rule in a grand jury proceeding, the Court of Appeals relied on Fed. Rule Crim. Proc. 41 (e). 465 F. 2d, at 1222–1224. Rule

## IV

In deciding whether to extend the exclusionary rule to grand jury proceedings, we must weigh the potential injury to the historic role and functions of the grand jury against the potential benefits of the rule as applied in this context. It is evident that this extension of the exclusionary rule would seriously impede the grand jury. Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial. Permitting witnesses to invoke the exclusionary rule before a grand jury would precipitate adjudication of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings. Suppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective.[7] The probable

---

41 (e) provides, in relevant part, that "[a] person aggrieved by an unlawful search and seizure may move the district court . . . for the return of the property and to suppress for the use as evidence anything so obtained . . . ." It further states that "[t]he motion shall be made before trial or hearing . . . ." We have recognized that Rule 41 (e) is "no broader than the constitutional rule." *Alderman* v. *United States,* 394 U. S. 165, 173 n. 6 (1969); *Jones* v. *United States,* 362 U. S. 257 (1960). Rule 41 (e), therefore, does not constitute a statutory expansion of the exclusionary rule.

The Court of Appeals also found that the Government's offer of immunity under 18 U. S. C. § 2514 was irrelevant to respondent's standing to invoke the exclusionary rule. 465 F. 2d, at 1221. We agree with that determination for the reasons stated in Parts III, IV, and V of this opinion.

[7] The force of this argument is well illustrated by the facts of the present case. As of the date of this decision, almost two and one-half years will have elapsed since respondent was summoned

result would be "protracted interruption of grand jury proceedings," *Gelbard* v. *United States,* 408 U. S. 41, 70 (1972) (WHITE, J., concurring), effectively transforming them into preliminary trials on the merits. In some cases the delay might be fatal to the enforcement of the criminal law. Just last Term we reaffirmed our disinclination to allow litigious interference with grand jury proceedings:

> "Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *United States* v. *Dionisio,* 410 U. S. 1, 17 (1973).

Cf. *United States* v. *Ryan,* 402 U. S. 530 (1971); *Cobbledick* v. *United States,* 309 U. S. 323 (1940). In sum, we believe that allowing a grand jury witness to invoke the exclusionary rule would unduly interfere with the effective and expeditious discharge of the grand jury's duties.

Against this potential damage to the role and functions of the grand jury, we must weigh the benefits to be derived from this proposed extension of the exclusionary rule. Suppression of the use of illegally seized evidence against the search victim in a criminal trial is thought to be an important method of effectuating the Fourth Amendment. But it does not follow that the Fourth Amendment requires adoption of every proposal that might deter police misconduct. In *Alderman* v. *United States,* 394 U. S., at 174–175, for example, this

---

to appear and testify before the grand jury. If respondent's testimony was vital to the grand jury's investigation in August 1971 of extortionate credit transactions, it is possible that this particular investigation has been completely frustrated.

Court declined to extend the exclusionary rule to one who was not the victim of the unlawful search:

"The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth."

We think this observation equally applicable in the present context.

Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best. Whatever deterrence of police misconduct may result from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal. Such an extension would deter only police investigation consciously directed toward the discovery of evidence solely for use in a grand jury investigation. The incentive to disregard the requirement of the Fourth Amendment solely to obtain an indictment from a grand jury is substantially negated by the inadmissibility of the illegally seized evidence in a subsequent criminal prosecution of the search victim. For the most part, a prosecutor would be unlikely to request an indictment where a conviction could not be obtained. We therefore decline to embrace a view that would achieve a speculative and undoubtedly

minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury.[8]

---

[8] Respondent relies primarily on *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920), which the dissent contends "plainly controls this case." *Post,* at 362. In that case, federal officers unlawfully seized certain documents belonging to the Silverthornes and their lumber company and presented them to a grand jury that had already indicted the Silverthornes and the company. A district court ordered the return of the documents but impounded photographs and copies of the originals. Later, the prosecutor caused the grand jury to issue subpoenas *duces tecum* to the Silverthornes and the company to produce the originals, and their refusal to comply led to a contempt citation. In reversing the judgment, the Court held that the subpoenas were invalid because they were based on knowledge obtained from the illegally seized evidence, citing *Weeks* v. *United States,* 232 U. S. 383 (1914). Mr. Justice Holmes, writing for the Court, stated that the "essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." 251 U. S., at 392.

*Silverthorne* is distinguishable from the present case in several significant respects. There, plaintiffs in error had previously been indicted by the grand jury and thus could invoke the exclusionary rule on the basis of their status as criminal defendants. Moreover, the Government's interest in recapturing the original documents was founded on a belief that they might be useful in the criminal prosecution already authorized by the grand jury. It did not appear that the grand jury needed the documents to perform its investigative or accusatorial functions. Thus, the primary consequence of the Court's decision was to exclude the evidence from the subsequent criminal trial. Finally, prior to the issuance of the grand jury subpoenas, there had been a judicial determination that the search and seizure were illegal. The claim of plaintiffs in error was not raised for the first time in a pre-indictment motion to suppress requiring interruption of grand jury proceedings.

By contrast, in the instant case respondent had not been indicted by the grand jury and was not a criminal defendant. Under traditional principles, he had no standing to invoke the exclusionary rule. The effect of the District Court's order was to deprive the grand

## V

Respondent also argues that each and every question based on evidence obtained from an illegal search and seizure constitutes a fresh and independent violation of the witness' constitutional rights.[9] Ordinarily, of course, a witness has no right of privacy before the grand jury. Absent some recognized privilege of confidentiality, every man owes his testimony. He may invoke his Fifth Amendment privilege against compulsory self-incrimination, but he may not decline to answer on the grounds that his responses might prove embarrassing or result in an unwelcome disclosure of his personal affairs. *Blair* v. *United States,* 250 U. S. 273 (1919). Respondent's claim must be, therefore, not merely that the grand jury's questions invade his privacy but that, because those questions are based on illegally obtained evidence, they somehow

jury of testimony it needed to conduct its investigation. Furthermore, respondent's motion to suppress had not been previously made and required interruption of the grand jury proceedings. In these circumstances, *Silverthorne* is certainly not controlling. To the extent that the Court's broad dictum might be construed to suggest a different result in the present case, we note that it has been substantially undermined by later cases. See Parts III and IV of this opinion.

[9] At oral argument, counsel for respondent stated the contention as follows:

"I submit to the Court that each question asked of the Respondent before the Grand Jury, which question was only asked because of a past violation of the Fourth Amendment, [amounts to] a new, immediate violation of the Fourth Amendment . . . . [A] question derived from a past violation, a question into the privacy of the witness amounts to another intrusion in violation of the Fourth Amendment." Tr. of Oral Arg. 17.

"[R]efusing to answer a question in which the question conceivably is derived from a past violation of the Fourth Amendment, gives rise to an additional or new Fourth Amendment right to resist answering that question because the question itself becomes an additional intrusion . . . ." Tr. of Oral Arg. 19–20.

constitute distinct violations of his Fourth Amendment rights. We disagree.

The purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects. The wrong condemned is the unjustified governmental invasion of these areas of an individual's life. That wrong, committed in this case, is fully accomplished by the original search without probable cause. Grand jury questions based on evidence obtained thereby involve no independent governmental invasion of one's person, house, papers, or effects, but rather the usual abridgment of personal privacy common to all grand jury questioning. Questions based on illegally obtained evidence are only a derivative use of the product of a past unlawful search and seizure. They work no new Fourth Amendment wrong. Whether such derivative use of illegally obtained evidence by a grand jury should be proscribed presents a question, not of rights, but of remedies.

In the usual context of a criminal trial, the defendant is entitled to the suppression of, not only the evidence obtained through an unlawful search and seizure, but also any derivative use of that evidence. The prohibition of the exclusionary rule must reach such derivative use if it is to fulfill its function of deterring police misconduct. In the context of a grand jury proceeding, we believe that the damage to that institution from the unprecedented extension of the exclusionary rule urged by respondent outweighs the benefit of any possible incremental deterrent effect. Our conclusion necessarily controls both the evidence seized during the course of an unlawful search and seizure and any question or evidence derived therefrom (the fruits of the unlawful search).[10] The same considerations of logic and policy apply to both the fruits

---

[10] It should be noted that, even absent the exclusionary rule, a grand jury witness may have other remedies to redress the injury to

of an unlawful search and seizure and derivative use of that evidence, and we do not distinguish between them.[11]

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

The Court holds that the exclusionary rule in search-and-seizure cases does not apply to grand jury proceedings because the principal objective of the rule is "to deter future unlawful police conduct," *ante,* at 347, and "it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal."

---

his privacy and to prevent a further invasion in the future. He may be entitled to maintain a cause of action for damages against the officers who conducted the unlawful search. *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971). He may also seek return of the illegally seized property, and exclusion of the property and its fruits from being used as evidence against him in a criminal trial. *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344 (1931). In these circumstances, we cannot say that such a witness is necessarily left remediless in the face of an unlawful search and seizure.

[11] The dissent's reliance on *Gelbard* v. *United States,* 408 U. S. 41 (1972), is misplaced. There, the Court construed 18 U. S. C. § 2515, the evidentiary prohibition of Tit. III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 211, as amended, 18 U. S. C. §§ 2510–2520. It held that § 2515 could be invoked by a grand jury witness as a defense to a contempt charge brought for refusal to answer questions based on information obtained from the witness' communications alleged to have been unlawfully intercepted through wiretapping and electronic surveillance. The Court's holding rested exclusively on an interpretation of Tit. III, which represented a congressional effort to afford special safeguards against the unique problems posed by misuse of wiretapping and electronic surveillance. There was no indication, in either *Gelbard* or the legislative history, that Tit. III was regarded as a restatement of existing law with respect to grand jury proceedings. As MR. JUSTICE WHITE noted in his concurring opinion in *Gelbard,* Tit. III "unquestionably

*Ante,* at 351. This downgrading of the exclusionary rule to a determination whether its application in a particular type of proceeding furthers deterrence of future police misconduct reflects a startling misconception, unless it is a purposeful rejection, of the historical objective and purpose of the rule.

The commands of the Fourth Amendment are, of course, directed solely to public officials. Necessarily, therefore, only official violations of those commands could have created the evil that threatened to make the Amendment a dead letter. But curtailment of the evil, if a consideration at all, was at best only a hoped-for effect of the exclusionary rule, not its ultimate objective. Indeed, there is no evidence that the possible deterrent effect of the rule was given any attention by the judges chiefly responsible for its formulation. Their concern as guardians of the Bill of Rights was to fashion an enforcement tool to give content and meaning to the Fourth Amendment's guarantees. They thus bore out James Madison's prediction in his address to the First Congress on June 8, 1789:

> "If they [the rights] are incorporated into the
> Constitution, independent tribunals of justice will

works a change in the law with respect to the rights of grand jury witnesses . . . ." 408 U. S., at 70.

The dissent also voices concern that today's decision will betray " 'the imperative of judicial integrity,' " sanction "illegal government conduct," and even "imperil the very foundation of our people's trust in their Government." *Post,* at 360. There is no basis for this alarm. "Illegal conduct" is hardly sanctioned, nor are the foundations of the Republic imperiled, by declining to make an unprecedented extension of the exclusionary rule to grand jury proceedings where the rule's objectives would not be effectively served and where other important and historic values would be unduly prejudiced. Cf. *Alderman* v. *United States,* 394 U. S. 165 (1969); *Linkletter* v. *Walker,* 381 U. S. 618 (1965); and cases cited *supra,* at 347–348.

consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439 (1789).

Since, however, those judges were without power to direct or control the conduct of law enforcement officers, the enforcement tool had necessarily to be one capable of administration by judges. The exclusionary rule, if not perfect, accomplished the twin goals of enabling the judiciary to avoid the taint of partnership in official lawlessness and of assuring the people—all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government.

That these considerations, not the rule's possible deterrent effect, were uppermost in the minds of the framers of the rule clearly emerges from the decision which fashioned it:

"The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. . . . The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . *should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all condi-*

*tions have a right to appeal for the maintenance of such fundamental rights. . . .*

. . . . .

"This protection is equally extended to the action of the Government and officers of the law acting under it. . . . *To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." Weeks* v. *United States,* 232 U. S. 383, 391–392, 394 (1914) (emphasis added).

Mr. Justice Brandeis and Mr. Justice Holmes added their enormous influence to these precepts in their notable dissents in *Olmstead* v. *United States,* 277 U. S. 438 (1928). Mr. Justice Brandeis said:

"In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Id.,* at 485.

And Mr. Justice Holmes said:

"[W]e must consider the two objects of desire, both of which we cannot have, and make up our minds which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the Government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained. . . . We have to

choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part.

".... If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed." *Id.*, at 470.

The same principles were reiterated less than six years ago. In *Terry* v. *Ohio,* 392 U. S. 1, 12–13 (1968), Mr. Chief Justice Warren said for the Court:

"The rule also serves another vital function—'the imperative of judicial integrity.' *Elkins* v. *United States,* 364 U. S. 206, 222 (1960). Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions."

It is true that deterrence was a prominent consideration in the determination whether *Mapp* v. *Ohio,* 367 U. S. 643 (1961), which applied the exclusionary rule to the States, should be given retrospective effect. *Linkletter* v. *Walker,* 381 U. S. 618 (1965). But that lends no support to today's holding that the application of the exclusionary rule depends solely upon whether its invocation in a particular type of proceeding will significantly further the goal of deterrence. The emphasis upon deterrence in *Linkletter* must be understood in the light of the crucial fact that the States had justifiably relied from 1949 to 1961 upon *Wolf* v. *Colorado,* 338 U. S. 25 (1949), and consequently, that application of *Mapp* would have required the wholesale release of innumerable convicted prisoners, few of whom could have been successfully retried. In that circumstance, *Linkletter* held not only that retrospective application of *Mapp* would not further the goal of deterrence but also

that it would not further "the administration of justice and the integrity of the judicial process." 381 U. S., at 637. Cf. *Kaufman* v. *United States,* 394 U. S. 217, 229 (1969).

Thus, the Court seriously errs in describing the exclusionary rule as merely "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect . . . ." *Ante,* at 348. Rather, the exclusionary rule is "part and parcel of the Fourth Amendment's limitation upon [governmental] encroachment of individual privacy," *Mapp* v. *Ohio, supra,* at 651, and "an essential part of both the Fourth and Fourteenth Amendments," *id.,* at 657, that "gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice." *Id.,* at 660.

This *Mapp* summation crystallizes the series of decisions that developed the rule and with which today's holding is plainly at war. For the first time, the Court today discounts to the point of extinction the vital function of the rule to insure that the judiciary avoid even the slightest appearance of sanctioning illegal government conduct. This rejection of "the imperative of judicial integrity," *Elkins* v. *United States,* 364 U. S. 206, 222 (1960), openly invites "[t]he conviction that all government is staffed by . . . hypocrites[, a conviction] easy to instill and difficult to erase." Paulsen, The Exclusionary Rule and Misconduct by the Police, 52 J. Crim. L. C. & P. S. 255, 258 (1961). When judges appear to become "accomplices in the willful disobedience of a Constitution they are sworn to uphold," *Elkins* v. *United States, supra,* at 223, we imperil the very foundation of our people's trust in their Government on which our democracy rests. See *On Lee* v. *United*

*States,* 343 U. S. 747, 758–759 (1952) (Frankfurter, J., dissenting). The exclusionary rule is needed to make the Fourth Amendment something real; a guarantee that does not carry with it the exclusion of evidence obtained by its violation is a chimera. Moreover,

> "[I]nsistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of short-cut methods in law enforcement impairs its enduring effectiveness." *Miller* v. *United States,* 357 U. S. 301, 313 (1958).

The judges who developed the exclusionary rule were well aware that it embodied a judgment that it is better for some guilty persons to go free than for the police to behave in forbidden fashion. A similar judgment led the Court to decide in *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920), that a grand jury must be denied access to plainly relevant but illegally seized papers. In that case, after federal agents unlawfully seized papers belonging to the Silverthornes and their corporation, and presented the documents to a grand jury which had previously indicted the Silverthornes, a district court ordered the documents returned and copies that had been prepared in the interim impounded. After returning the originals, the grand jury attempted to recoup them by issuance of a subpoena *duces tecum.* Compliance with the subpoena was refused, and contempt convictions followed. In reversing the judgment of convictions, the Court, speaking through Mr. Justice Holmes, held that the Government was barred from utilizing any fruits of its forbidden act,

stating that "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Id.,* at 392.

*Silverthorne* plainly controls this case. Respondent, like plaintiffs in error in *Silverthorne*,[1] seeks to avoid furnishing the grand jury with evidence that he would not have been called upon to supply but for the unlawful search and seizure. The Court would distinguish *Silverthorne* on the ground that there the plaintiffs in error had been indicted and could invoke the exclusionary rule "on the basis of their status as criminal defendants," since the Government's effort to obtain the documents was "founded on a belief that they might be useful in the criminal prosecution already authorized by the grand jury." *Ante,* at 352 n. 8. The effort was clearly not founded on any such belief. Overlooked is the fact that the grand jury's interest in again obtaining the documents in *Silverthorne* may well have been to secure information leading to further criminal charges, especially since indictments of three other individuals, as well as additional indictments of the Silverthornes, had been the consequence of initial submission of the documents to the grand jury. See Brief on Behalf of Plaintiffs in Error in No. 358, O. T. 1919, pp. 4, 18–19.[2]

---

[1] Neither the Silverthorne Lumber Co., because it was a corporation, see *Hale* v. *Henkel,* 201 U. S. 43 (1906), nor respondent, because he was granted transactional immunity, could invoke the privilege against self-incrimination. The situations are therefore completely comparable.

[2] The Court also argues that "[t]he [Silverthorne's claim] was not raised for the first time in a pre-indictment motion to suppress requiring interruption of grand jury proceedings," *ante,* at 352 n. 8, and therefore presumably its assertion occasioned no delay. However, the District Court in *Silverthorne* had granted an earlier application for return of the seized documents from the grand jury after

Only if *Silverthorne* is overruled can its precedential force to compel affirmance here be denied.

Congressional concern with the *Silverthorne* holding was clearly evidenced in enactment of 18 U. S. C. § 2515, providing that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication *and no evidence derived therefrom* may be received in evidence in any . . . proceeding in or before *any . . . grand jury . . .* if the disclosure of that information would be in violation of this chapter." (Emphasis added.) In *Gelbard* v. *United States,* 408 U. S. 41 (1972), we set aside the adjudication in criminal contempt of a grand jury witness who refused to comply with a court order to testify on the ground that interrogation was to be based upon information obtained from the witness' communications allegedly intercepted by federal agents by means of illegal wiretapping and electronic surveillance. Our reasons track the grounds advanced in *Silverthorne*.

> "The purposes of § 2515 and Title III as a whole would be subverted were the plain command of § 2515 ignored when the victim of an illegal interception is called as a witness before a grand jury and asked questions based upon that interception. Moreover, § 2515 serves not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also 'to protect the integrity of court and administrative proceedings.' Consequently, to order a grand jury witness, on pain of imprisonment, to disclose evidence that § 2515 bars in unequivocal terms is both

determining that they had been obtained in violation of the Fourth Amendment. This Court made no intimation that the District Court acted improperly in considering the initial application.

to thwart the congressional objective of protecting individual privacy by excluding such evidence and to entangle the courts in the illegal acts of Government agents." 408 U. S., at 51 (footnotes omitted).

Similarly to allow Calandra to be subjected to questions derived from the illegal search of his office and seizure of his files is "to thwart the [Fourth and Fourteenth Amendments' protection] of . . . individual privacy . . . and to entangle the courts in the illegal acts of Government agents." *Ibid.* "And for a court, on petition of the executive department, to sentence a witness, who is [himself] the victim of the illegal [search and seizure], to jail for refusal to participate in the exploitation of that [conduct in violation of the explicit command of the Fourth Amendment] is to stand our whole system of criminal justice on its head." *In re Evans,* 146 U. S. App. D. C. 310, 323, 452 F. 2d 1239, 1252 (1971) (Wright, J., concurring).

It is no answer, to suggest as the Court does, that the grand jury witnesses' Fourth Amendment rights will be sufficiently protected "by the inadmissibility of the illegally seized evidence in a subsequent criminal prosecution of the search victim." *Ante,* at 351. This, of course, is no alternative for Calandra, since he was granted transactional immunity and cannot be criminally prosecuted. But the fundamental flaw of the alternative is that to compel Calandra to testify in the first place under penalty of contempt necessarily "thwarts" his Fourth Amendment protection and "entangle[s] the courts in the illegal acts of Government agents"—consequences that *Silverthorne* condemned as intolerable.

To be sure, the exclusionary rule does not "provide that illegally seized evidence is inadmissible against any-one for any purpose." *Alderman* v. *United States,* 394 U. S. 165, 175 (1969). But clearly there is a crucial

distinction between withholding its cover from individuals whose Fourth Amendment rights have not been violated—as has been done in the "standing" cases, *Alderman* v. *United States, supra; Jones* v. *United States,* 362 U. S. 257 (1960)—and withdrawing its cover from persons whose. Fourth Amendment rights have in fact been abridged.

Respondent does not seek vicariously to assert another's Fourth Amendment rights. He himself has been the victim of an illegal search and desires "to mend no one's privacy [but his] own." *Gelbard* v. *United States, supra,* at 63 (DOUGLAS, J., concurring). Respondent is told that he must look to damages to redress the concededly unconstitutional invasion of his privacy. In other words, officialdom may profit from its lawlessness if it is willing to pay a price.

In *Mapp,* the Court thought it had "close[d] the only courtroom door remaining open to evidence secured by official lawlessness" in violation of Fourth Amendment rights. 367 U. S., at 654–655. The door is again ajar. As a consequence, I am left with the uneasy feeling that today's decision may signal that a majority of my colleagues have positioned themselves to reopen the door still further and abandon altogether the exclusionary rule in search-and-seizure cases; for surely they cannot believe that application of the exclusionary rule at trial furthers the goal of deterrence, but that its application in grand jury proceedings will not "significantly" do so. Unless we are to shut our eyes to the evidence that crosses our desks every day, we must concede that official lawlessness has not abated and that no empirical data distinguishes trials from grand jury proceedings. I thus fear that when next we confront a case of a conviction rested on illegally seized evidence, today's decision will be invoked to sustain the conclusion in that case

also, that "it is unrealistic to assume" that application of the rule at trial would "significantly further" the goal of deterrence—though, if the police are presently undeterred, it is difficult to see how removal of the sanction of exclusion will induce more lawful official conduct.

The exclusionary rule gave life to Madison's prediction that "independent tribunals of justice . . . will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439 (1789). We betray the trust upon which that prediction rested by today's long step toward abandonment of the exclusionary rule. The observations of a recent commentator highlight the grievous error of the majority's retreat:

> "If constitutional rights are to be anything more than pious pronouncements, then some measurable consequence must be attached to their violation. It would be intolerable if the guarantee against unreasonable search and seizure could be violated without practical consequence. It is likewise imperative to have a practical procedure by which courts can review alleged violations of constitutional rights and articulate the meaning of those rights. The advantage of the exclusionary rule—entirely apart from any direct deterrent effect—is that it provides an occasion for judicial review, and it gives credibility to the constitutional guarantees. By demonstrating that society will attach serious consequences to the violation of constitutional rights, the exclusionary rule invokes and magnifies the moral and educative force of the law. Over the long term this may integrate some fourth amendment ideals into the value system or norms of behavior of law enforcement agencies." Oaks, Studying the

Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 756 (1970).

See also Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv. L. Rev. 1532, 1562–1563 (1972).

I dissent and would affirm the judgment of the Court of Appeals.