UNITED STATES of America, Plaintiff,

v.

Joseph ISGRO, Raymond Anderson, and Jeffrey S. Monka, Defendants.

No. CR–89–951–JMI.

United States District Court,
C.D. California.

Sept. 4, 1990.

William S. Lynch, Sr. Counsel for Litigation, Dept. of Justice, Drew S. Pitt, Asst. U.S. Atty., Organized Crime Strike Force, Los Angeles, Cal., for plaintiff.

Donald M. Re, Los Angeles, Cal., for Isgro.

Michael W. Mayock, Pasadena, Cal., for Anderson.

Gerson Horn, Beverly Hills, Cal., for Monka.

## OPINION AND ORDER DISMISSING CASE WITH PREJUDICE

IDEMAN, District Judge.

IT IS HEREBY ORDERED:

The Court hereby DISMISSES WITH PREJUDICE the above-entitled action.

### I. BACKGROUND FACTS

Defendants JOSEPH ISGRO, RAYMOND ANDERSON, and JEFFREY S. MONKA (hereinafter defendants, collectively) were in indicted by the Grand Jury on November 30, 1989. The indictment contained 57 counts. Of those, only counts 21 through 24, inclusive, named RAYMOND ANDERSON and only counts 45 and 52 through 57, inclusive, named JEFFREY MONKA. JOSEPH ISGRO is named in 51 of the 57 counts. The indictment charged ISGRO with RICO violations, mail fraud, various conspiracies, payola, filing of false income tax returns, and obstruction of justice. ANDERSON was charged with mail fraud and conspiracy. MONKA was charged with filing false tax returns and conspiracy.

The prosecution of this case was handled by attorneys William S. Lynch and Drew S. Pitt from the Organized Crime Strike Force of the Department of Justice. Throughout the pretrial period, defendants repeatedly sought discovery of exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). The Government told the defense and the Court that all *Brady* material either had been released or would be released shortly before trial. Any delay was attributable to threats to a protected witness. Additionally, upon urging of the Court, the Government released Jencks Act material two weeks prior to trial.

The Government's main witness in this case was Dennis DiRicco, an attorney/accountant, and an alleged unindicted coconspirator. In late 1988, DiRicco was tried in the Federal District Court in the Northern District of California for charges involving money laundering and narcotics. Although DiRicco testified in his own defense at his trial and a transcript of his testimony was prepared, the Government never disclosed these facts to these defendants and this Court.

In April, 1989, Mr. Lynch received a copy of that transcript. He read the transcript and, with considerable understatement, said that he "noted some areas in the transcript that he wanted to question Mr. DiRicco about." Indeed, much of DiRicco's testimony contained statements which a prosecutor would certainly want to discuss with him if that prosecutor was considering using him as a witness against these defendants. In fact, that *testimony constituted a complete and detailed denial of any wrongdoing not only by himself, but also by any of the defendants in this case.*

Among other things, DiRicco *denied* in sworn testimony before his trial jury acquiring cash from drug dealers, *denied* taking that cash to ISGRO personally, and *denied* sending it to him via ISGRO's employee, David Michael Smith. Furthermore, DiRicco *denied* helping cash couriers avoid security checks at San Francisco International Airport, *denied* conspiring with ISGRO and others to defraud the Government of income tax, and *denied* conspiring with ISGRO or anyone else to commit any crime. Evidently, that testimony had considerable effect on *his* jury since it only convicted him of two counts and acquitted him of eight counts.

Whether or not any questioning of DiRicco by Mr. Lynch took place, what was said, and the results, if any, are not known to

this Court. In any event, four months later, in August, 1989, Mr. Lynch called DiRicco before the Grand Jury in this case as a witness. Personally handling the questioning of DiRicco, Mr. Lynch extracted a story from him that was diametrically opposed to his prior trial testimony in every important respect. Yes, DiRicco now swore, he *had* received cash from drug dealers, yes, he *had* supplied said cash to ISGRO for criminal purposes, and yes, he *had* delivered it to ISGRO personally and by way of Mr. Smith. Yes, he *had* further helped cash couriers avoid security at the San Francisco International Airport, and yes, he *had* conspired with ISGRO and others to defraud the Government and record companies. Moreover, DiRicco described phony paper transactions set up by himself, ISGRO, and others which were false and part of the criminal scheme. And yes, ANDERSON and MONKA were in on it too.

Despite this dramatic 180 degree switch from DiRicco's former sworn trial testimony, Mr. Lynch failed to reveal any of that prior testimony to the Grand Jury. He neither asked DiRicco about it before the Grand Jury, nor read the prior testimony to the Grand Jury. In fact, although the Government informed the Grand Jury that the witness had been convicted and had made a plea agreement, the Government failed to tell the Grand Jury that DiRicco had *testified* at his trial, much less that a *transcript* had been prepared and was available. Thereafter, the Grand Jury returned the indictment herein and the case was assigned to this Court.

During the pendency of the trial, defendants made numerous discovery motions, requesting any *Brady* material, among other things. Counsel for the Government neither produced DiRicco's trial transcript nor acknowledged its existence. Instead, the prosecution repeatedly denied the existence of material which would tend to exonerate the defendants, i.e. *Brady* material. Furthermore, Government counsel solemnly assured this Court that they fully understood their obligation to furnish such material to the defense and that they would certainly do so if any material was found.

Unfortunately, said the Government, there just didn't exist any material of that nature. (When these representations were made, the Government had been in possession of DiRicco's trial transcript for over a year.)

Approximately three weeks before trial began, the Government turned over a large amount of discovery to the defense, including some material pertaining to DiRicco. This material consisted of a copy of DiRicco's statements to the Government made *after* he had agreed to cooperate. However, this material included neither a copy of the trial transcript, nor any acknowledgment of its existence.

Defense counsel finally investigated on their own for possible evidence that might exist in the courthouse in the Northern District of California. Defendants thus learned for the first time that DiRicco had testified at his trial and that a transcript of his testimony existed. Defense counsel were then able to procure a copy of that transcript.

On August 28, 1990, in a chambers conference during the trial, defense counsel produced a copy of the transcript and represented to the Court that it contained material completely contrary to DiRicco's Grand Jury testimony and thus constituted *Brady* material heretofore concealed by the Government. Defendants asserted that the prosecution had failed to comply with its discovery obligations and promises, and, further, that the prosecution had knowingly and repeatedly made misrepresentations to the Court and defense counsel. Finally, defendants requested sanctions against the Government.

In response, Mr. Lynch flatly denied that there was any inconsistency between the two sets of testimony. Thereafter the Court ordered briefing on the subject. Both sides presented briefs. Defendants' brief contained a detailed, page-by-page comparison between the trial testimony and the Grand Jury testimony, showing beyond a doubt that the two sets of testimony were completely contrary to each other. Again, the defense brief asserted that the

Government had acted improperly and that sanctions should be imposed.

The Government's brief wisely retreated from the prosecution's original position that the material was not contradictory, and thus not impeaching. The Government's position now was that Mr. Lynch had only read the material once, suggesting that he was not really familiar with it, and besides, it was a public record available to the defendants. This claim of availability as a public record did not mention that the Government had failed to divulge the very existence of the transcript and had, through evasions and half-truths, given the impression that no such record existed.

## II. ISSUES

The first issue in this case is whether the prosecution has usurped the functions of the Grand Jury by its actions so as to deprive defendants of their Fifth Amendment rights to a fair hearing by an impartial and independent Grand Jury.

The second issue in this case is whether the Court should exercise its inherent supervisory powers to dismiss the indictment in this action due to a pattern of outrageous Government misconduct.

## III. ANALYSIS

Defendants contend that dismissal with prejudice is warranted for a variety of reasons. First, they claim that the failure of the government at the Grand Jury hearing to present the prior sworn contrary testimony of their main witness, Dennis DiRicco, or even to make the Grand Jury aware that such testimony existed, denies the defendants a fair hearing before that Grand Jury. They contend that the lack of a fair hearing denies them due process guarantees under the Fifth Amendment of the United States Constitution and, therefore, dismissal of the indictment is warranted on constitutional grounds.

Moreover, defendants move to dismiss on the grounds that the above-mentioned conduct by the Government before the Grand Jury together with the repeated refusal of the prosecution to provide DiRicco's prior testimony or to even acknowledge its exist-ence—indeed, its *denial* of the existence of *Brady* material—constitutes outrageous governmental conduct. Defendants contend that these actions justify dismissal based upon the inherent supervisory power of the Court. As an additional aggravating factor, defendants point to an earlier action in this case by Judge Rymer wherein she dismissed the indictment against another defendant. She found that the Government had committed outrageous misconduct as to her, involving misrepresentations to the Court and impermissible coercion of the defendant and her husband, the latter being a witness called at this trial against these defendants. Therefore, defendants seek a dismissal on either or both grounds *with prejudice.*

### Usurpation of Grand Jury Functions

■ In regards to usurpation of the functions of the Grand Jury, courts have long held that the independence of the Grand Jury must be carefully guarded. *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960); *United States v. Samango,* 607 F.2d 877, 882 (9th Cir.1979).

In *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the Supreme Court held that the District Court has jurisdiction to oversee the Grand Jury process and to insure its independence. *Id.* at 346, 94 S.Ct. at 619; *Bursey v. United States,* 466 F.2d 1059, 1082 (9th Cir.1972).

Courts rarely dismiss an indictment for prosecutorial misconduct in order to avoid encroaching on the independence of prosecutors and grand juries. *Samango, supra,* at 881. However, the Ninth Circuit has held that dismissal is a proper remedy in cases of flagrant overreaching or deception by the prosecution: "Although deliberate introduction of perjured testimony is perhaps the most flagrant example of misconduct, other prosecutorial behavior, even if unintentional, can also cause improper influence and usurpation of the grand jury's role." *Id.* at 882. As previously noted, the prosecutorial behavior in this case was intentional.

The Supreme Court has recently articulated a test to determine whether the Grand Jury indictment should be dismissed. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255–56, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988). Courts may dismiss indictments when the " 'violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations. [Cites omitted.]" *Bank of Nova Scotia, supra*, at 256, 108 S.Ct. at 2374.

In its brief, the Government makes the following contentions: (i) With respect to the Grand Jury proceedings, the Government asserts that impeachment of a witness in the Grand Jury is not required; (ii) Even if it were required, the Government contends that dismissal of the indictment is not the proper remedy; and (iii) The prosecution implies, but does not claim, that Government counsel may not have had an accurate recollection of the contents of DiRicco's trial testimony.

Taking the last assertion first, this Court believes that whatever be the failings of Government counsel, lack of diligent preparation and inattention to detail are not among them. Government counsel have impressed the Court with an encyclopedic knowledge of the facts of the case. The Court, naturally, has no way of ascertaining how many times and with what degree of thoroughness a Government attorney examines an item of evidence. Given the importance attached to this case by the Government and the large amount of time and effort spent by the prosecution in preparation, there is not the slightest doubt in the mind of this Court that Government counsel were at all times completely familiar with the contents of their chief witness' trial testimony. The Court rejects any implication to the contrary.

In regards to the lack of a requirement to impeach a Grand Jury witness, it is correct that, standing alone, such is often true. However, the Supreme Court and other federal courts, including those in the Ninth Circuit, have been concerned on occasion with possible usurpation of the function of the Grand Jury by the prosecution. The fear is that a Grand Jury sufficiently controlled by the Government thus becomes a kind of "rubber stamp" for the wishes of the prosecutor. The Fifth Amendment Due Process clause of the Constitution guarantees citizens who are to be charged with serious crimes in the federal courts the right to have their cases screened by a Grand Jury of their fellow citizens before being put on trial. If the presentation to the Grand Jury is done unfairly and essential information is withheld, the Grand Jury is thus unable to make a decision based on a fair assessment of the evidence. Then the indictment in fact becomes the decision of the prosecutor and not of the Grand Jury, thereby causing fundamental unfairness and a violation of a defendant's constitutional rights.

Consider the situation here: The charges are very serious, particularly with respect to ISGRO, including a RICO claim with severe criminal and civil penalties. The witness, DiRicco, is probably the only one who can prove much, or all, of the RICO violations alleged, as well as numerous other counts against ISGRO. Codefendants ANDERSON and MONKA probably could not have been indicted at all absent the testimony of DiRicco. Furthermore, the witness is already in a suspect category: He has been convicted of felonies and has made a plea agreement with the Government whereby the Government has something to say about his eventual sentencing. Thus, DiRicco has great motivation to conform his testimony to attempt to please the Government.

Courts routinely caution juries to consider such facts as plea agreements in weighing the credibility of witnesses for just this reason. If the Grand Jury had known that DiRicco had testified under oath at a prior time to a entirely different set of facts that served his interests at that earlier time, the Grand Jury's evaluation of his contrary testimony before them, again at a time when a contrary version served his needs, that knowledge would have a strong potential of adversely affecting their evaluation of his credibility.

The Government certainly must think so. It kept that contradictory information from the Grand Jury for the same reason it attempted to keep it from the trial jury: They feared the devastating effect it would probably have had on DiRicco's credibility. This Court cannot say with certainty what the Grand Jury would have done if it had known the full story. However, the Court can say that the decision was for the Grand Jury to make, *not* the prosecution. By making the decision for the Grand Jury, the Government usurped the function of the Grand Jury, caused fundamental unfairness to arise in the indicting process, and violated the defendants' constitutional rights to a fair Grand Jury hearing.

Contrary to the Government's assertion that dismissal of the indictment is not the remedy for its misconduct in the presentation to the Grand Jury, the Court finds that dismissal with prejudice is precisely the remedy called for since said failure to disclose constitutes constitutional error, under the facts of this case.

### The Court's Inherent Supervisory Power

■ An alternative ground for dismissal of this case is found in the Court's inherent supervisory power to dismiss an improper indictment in its obligation to ensure the fundamental fairness of judicial proceedings. The Ninth Circuit has long held that the District Courts have an inherent supervisory power to dismiss an indictment for either prosecutorial misconduct or violation of constitutional due process. *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir.1974); *United States v. Samango*, 607 F.2d 877, 884 (9th Cir.1979).

The Supreme Court has recently held that District Courts may *not* invoke their supervisory powers merely to correct harmless error. *Bank of Nova Scotia, supra*, at 255–56, 108 S.Ct. at 2374.

The Due Process clause of the Fifth Amendment states that "[n]o person shall ... be deprived of life, liberty, or property without due process of law."

In the present case, this Court chooses to exercise its supervisory power not only be-

cause of the usurpation discussed above, but also because of various other actions taken by the Government in prosecuting this matter. These prosecutorial actions have resulted in violation of the defendants' due process under the Constitution.

First, the Government withheld vital evidence from the Grand Jury which indicted the defendants, as discussed above. Next, the Government carefully failed to reveal that the main prosecution witness, DiRicco, had testified at his own prior trial, telling a story completely exonerating these defendants. Also, the Government continually misrepresented the existence of this *Brady* material to defendants' counsel and to the Court, despite ongoing requests. Upon being confronted finally with its false statements to Court and counsel, the Government's reaction was to stonewall and simply deny the obvious.

■ Moreover, the Government's contentions relating to the failure to disclose the prior testimony as *Brady* material are to the effect that the transcript is merely a witness' statement and, as such, subject to the Jencks Act and not discoverable until after the witness has testified on direct examination. The prosecution hints (but, carefully, does not claim) that they would have turned it over at that time and then implied, in effect: No harm, no foul; the defense has it now, even earlier than they are entitled to it!

The Court finds these positions untenable. It is clear that *Brady* material can be composed of inconsistent statements of witnesses. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Bagley*, 473 U.S. 667, 675–76, 105 S.Ct. 3375, 3379–81, 87 L.Ed.2d 481 (1985); and *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir.1986). The Government denies that it had *Brady* material on numerous occasions and claims that it turned over what it considered to be Jencks material on DiRicco and other witnesses before trial. How would the Government explain turning over the prior trial transcript when DiRicco testified at trial, having planted its feet clearly in the

concrete of denying the existence of *Brady* material and that the Jencks material had already been turned over? The Government's lack of good faith appears clearly in their reaction upon finding out that the defense had obtained the trial transcript. That reaction was to deny that *anything* in that transcript constituted a prior inconsistent statement. Thus, having been caught with a smoking pistol, the Government, having previously denied that it had a pistol, now denied that the pistol smoked.

■ The Government then attempts to further cloud the issues by contending that the transcript of the former testimony is a "public record" available to the defense and thus, the prosecution need not have produced it under *Brady*. What this argument overlooks is that one needs to know of the *existence* of a public record before one can obtain and read it. The Government has been very careful throughout the pendency of this case not to mention that DiRicco testified at his own trial. It is noteworthy that the trial occurred in the Northern District of California and that the records are therefore in a courthouse hundreds of miles from this Los Angeles courthouse. Also, where the defense is continually lulled by the Government with false assurances that exculpatory evidence does not exist, it cannot be said that their failure (at first) to find such evidence excuses the Government from its obligations to provide it.

It is the belief and finding of this Court, contrary to the Government's hint that they would have provided this material, that it was the Government's intent not to ever provide this material to the defense, for the same reason that it was withheld from the Grand Jury: The prosecution feard the effect it would have upon DiRicco's credibility, and, thus, their case.

Moreover, the withheld evidence of DiRicco's testimony is crucial to the defense case. This testimony completely exonerates all the defendants while showing the Government's main witness to be a perjurer (either at his trial or before the Grand Jury). The testimony of Mr. DiRicco is *the most important prosecution tes-* *timony* in this case. Without said testimony, the two minor defendants, Anderson and Monka, could not have been indicted at all. Moreover, the major defendant, ISGRO, could have only been indicted on misdemeanor payola charges.

Furthermore, the Government engaged in active misrepresentation to the Court regarding the existence of *Brady* material. The Government explicitly told the Court that all *Brady* material had been turned over to the defense.

Finally, the Court notes that this is not the first instance of misconduct by the prosecuting attorneys in this case. The Court's attention has been drawn to an earlier incident in a related case, *United States v. Valerie Tashjian*, CR–88–124(B) PAR, wherein the Strike Force attorneys were found by Judge Rymer to have been guilty of outrageous governmental misconduct by coercive tactics used towards a defendant and by misrepresentations to Judge Rymer to such a degree that she dismissed the indictment as to that defendant.

The Court finds that there has been outrageous governmental misconduct in this case to the extent that the exercise of the supervisory power of the Court to insure that the ends of justice shall prevail should be exercised.

Regrettably, this Court must agree with Judge Rymer wherein she said: "... it is clear that the course of conduct of the Strike Force lawyers falls well below the standard of conduct expected of government prosecutors."

Therefore, the Court hereby orders that a mistrial be declared and that the indictment be dismissed with prejudice.

IT IS SO ORDERED.