**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 94-5692

IVAN FRANCION WILKERSON,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CR-94-34)

Argued: February 1, 1996

Decided: April 2, 1996

Before NIEMEYER and MICHAEL, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Edwin Walker, Jr., JOHNSON & WALKER,
P.C., Richmond, Virginia, for Appellant. Nicholas Stephan Altimari,
OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Vir-
ginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attor-
ney, David J. Novak, Assistant United States Attorney, Richmond,
Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Ivan Francion Wilkerson appeals his convictions for possession of an unregistered firearm, 26 U.S.C. § 5861(d), and for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), on the grounds that there was insufficient evidence at trial from which the jury could have found that he had possessed the firearm. Finding the evidence sufficient, we affirm his convictions.

I.

At Wilkerson's trial, Officer Kendall Gammon testified that on the night of December 6, 1993 he saw a car leaving an apartment complex and noticed that its "tag light"--the light that illuminates a car's license plate--was not on. He turned on his blue light and siren in an effort to stop the car, which had two people in it. No one disputes that the driver of the car was the defendant-appellant here, Ivan Wilkerson. The car neither stopped nor accelerated significantly but drove through a residential area until it pulled into the driveway of what turned out to be the house of Wilkerson's grandfather and drove up and around to the back of the house. Gammon followed, losing sight of the car for just a few seconds as it went behind the house but quickly regaining sight of it. Then, from thirty to forty feet behind the car, Gammon saw a person get out of the driver's door with an object in his hand. His "first thought" was that the object was an umbrella because it had "a small, like a hook, on the rear part of the object . . ." But he immediately also wondered if it might be a weapon. He then saw the person run from the car into the yard of the next-door neighbor and disappear around the corner of the garage.

Gammon testified that he did not follow Wilkerson because of safety concerns. Instead, he called on his police radio for assistance in setting up a perimeter around the area and for a tracking dog. Offi-

2

cer George Carey arrived with the tracking dog and set the dog to looking for tracks. At trial, Carey testified that the dog found a recently made track on his first try and followed it along a path that passed about thirty yards to the left of where two shotguns would eventually be found. Carey pulled the dog off that track when they reached a parking lot. On his second attempt, in an entirely different direction, the dog found no track. On his third attempt, he again found a track, and Carey again pulled him off the track when he reached the parking lot. This third track ran in the same general direction as the first and passed about ten yards to the left of the place where the guns were eventually found. Finally, Carey took the dog into the woods just to look around. Without finding a track, Carey and the dog immediately came on two shotguns a small distance behind a woodpile. The dog immediately reacted to the guns--pawing and playing with them--in a way that indicated to Carey that they had been handled within the last hour, give or take a half hour, although neither the dog's reaction nor any other evidence in the case could by itself link the guns specifically to Wilkerson.

Another officer, David Fauver, then testified that, while Carey and Gammon were recovering the guns, he spoke to Wilkerson's grandfather, who gave Fauver an address where he could find Wilkerson and the passenger. Fauver and Gammon went to that address and found Wilkerson and the passenger. The officers questioned Wilkerson, and Wilkerson admitted to having been the driver of the car, claimed that he fled only because he was afraid of being beaten up by the police, and denied any knowledge of any guns.

Wilkerson did not testify or put on any evidence of his own.

II.

On an insufficiency claim, we must ask whether there is substantial evidence, viewed in the light most favorable to the government, to support the verdict. Glasser v. United States , 315 U.S. 60, 80 (1942); United States v. Blue, 957 F.2d 106, 107 (4th Cir. 1992). In this case of firearm possession, then, the question is whether there was substantial evidence to support the jury's finding that Wilkerson had actually possessed a firearm.

3

Circumstantial though it was, the evidence at trial, as described above, certainly constituted the "substantial" evidence required by <u>Glasser</u> to sustain a conviction. The evidence showed that Wilkerson and his passenger had fled from the police both in Wilkerson's car and on foot rather than, for example, proceeding for protection to a public place or into Wilkerson's grandfather's house; that Wilkerson had had in his hand an object that could fit the description of a shotgun; that fairly fresh tracks had been found leading from the car in the general direction of the home where Wilkerson was ultimately found; that two shotguns had been found not very far from those tracks; and that those shotguns had borne evidence of human handling within the last hour-and-a-half at the most. Wilkerson was certainly free at trial to attack this evidence as circumstantial and to attempt to undermine the reliability of the canine evidence and the credibility of the government's witnesses. And he did so. But the jury was entitled to find the witnesses credible and the tracking dog reliable. Having done so, the jury was justified in finding that Wilkerson had, indeed, possessed at least one of the shotguns found that night.

Wilkerson relies mainly on our decision in <u>Blue</u> to defeat this conclusion, but <u>Blue</u> has little bearing here. In that case, the government tried to show constructive possession by evidence that a gun was found under the automobile passenger seat in which Blue was sitting and that the officer who stopped the car saw Blue dip his shoulder as the officer approached the car. But <u>Blue</u> stands only for the propositions that mere accessibility does not prove constructive possession and that a "shoulder dip alone does not transform[a person] from a mere passenger in the car to a possessor of whatever is discovered underneath the seat in which he is sitting." <u>Blue</u>, 957 F.2d at 108. <u>Blue</u> may serve as a helpful reminder that some kinds of circumstantial evidence are not enough to sustain a firearm possession conviction, but it does not help much in evaluating the different kind and quantity of circumstantial evidence at issue in Wilkerson's case.

<u>AFFIRMED</u>

4