UNITED STATES of America

v.

**David M. ARMSTRONG, Defendant.**

**Criminal No. 91–526–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 17, 1998.

Helen F. Fahey, United States Attorney, Thomas M. Hollenhorst, Assistant United States Attorney, Alexandria, VA, for plaintiff.

Michael W. Lieberman, Alexandria, VA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Is the exclusionary rule applicable in supervised release revocation hearings? This is the troublesome question presented by the petition for revocation of defendant David Armstrong's supervised release based on evidence seized incident to his arrest in the District of Columbia, which evidence was ultimately suppressed in the District of Columbia prosecution stemming from that arrest. A Fourth Circuit decision, *United States v. Workman*, 585 F.2d 1205 (4th Cir.1978), holds that the exclusionary rule does apply in the similar context of federal probation revocation hearings. Yet, in reaching this conclusion, the Fourth Circuit panel also set forth an approach for analyzing the applicability of the exclusionary rule, which, if followed today, would lead to a different conclusion.

### I.

In 1992, Armstrong pled guilty to one of several indicted counts, specifically conspiracy to possess and distribute 50 grams or more of cocaine base and five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. He was sentenced on April 24, 1992, to 210 months in prison and 5 years of supervised release. This sentence was later reduced to 70 months, pursuant to Rule 35, Fed.R.Crim.P.[1]

Armstrong was released from custody on January 17, 1997. Thereafter, he was arrested again on April 22, 1998 in the District of Columbia, when following a routine traffic stop, a search of his vehicle resulted in the seizure of a loaded .38 caliber Colt revolver and 36 Ziploc bags containing 3.1 grams of cocaine base. As a result, Armstrong was indicted in the United States District Court for the District of Columbia, where in pretrial motion practice, he successfully moved to suppress the evidence retrieved during the stop.[2] Given this, the government dismissed the District of Columbia case on November 5, 1998.

The instant petition was filed May 3, 1998, prior to the ruling on the suppression motion. Resolution of the petition was continued pending the disposition of the District of Columbia prosecution. With the dismissal of

---

1. Although not material to the question at bar, the government notes that this sentence reduction occurred prior to the completion of Armstrong's cooperation and that Armstrong's cooperation after receiving the reduction was less than full and complete.

2. The motion was initially denied and then granted on reconsideration, the district judge apparently concerned over inconsistencies in the police officers' testimony. The government did not appeal this ruling.

that case, this matter is now ripe. At issue here is the application of the exclusionary rule in hearings for revocation of supervised release.[3] The application of the exclusionary rule to federal probation revocation hearings was addressed in *United States v. Workman,* which is relevant circuit precedent applicable to revocation of supervised release hearings.[4] In *Workman,* a panel of the Fourth Circuit acknowledged numerous circuit court decisions to the contrary, but held nonetheless that, under Supreme Court precedent, the exclusionary rule applies to probation hearings.

Ordinarily, the existence of Fourth Circuit precedent directly on point would end the analysis. Yet here, the government argues that subsequent Supreme Court opinions, especially *Pennsylvania Board of Probation and Parole v. Scott,* 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998), have so eroded the basis of *Workman* that it can no longer be regarded as authoritative circuit precedent. This Memorandum Opinion addresses this contention.

## II.

In *Workman,* the Fourth Circuit held that in determining the applicability of the

exclusionary rule, lower courts should conduct the balancing test enunciated by the Supreme Court in *United States v. Calandra,* 414 U.S. 338, 349, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), primarily "by comparing revocation hearings with other instances where the Supreme Court has considered the rule's application." *See Workman,* 585 F.2d at 1210. The *Calandra* test requires courts to balance the potential injury to the proceeding against the potential benefits of applying the rule. *See id.* at 1209. Thus, *Workman* teaches that the balancing process should be guided by comparison of supervised release revocation hearings with the Supreme Court's assessment of the deterrent effects of the exclusionary rule in other contexts. *See id.* at 1210.[5] In making this comparison, the *Workman* court found persuasive that "the Supreme Court has never exempted from the operation of the exclusionary rule any adjudicative proceeding in which the government offers unconstitutionally seized evidence in direct support of a charge that may subject the victim of a search to imprisonment." *Id.* at 1211.[6] Significantly, it is doubtful that this statement continues accurately to reflect the current state of Supreme Court jurisprudence.

3. Also at issue is whether the doctrine of collateral estoppel precludes relitigation of the underlying facts and legality of the search. Armstrong asserts that because the issue has been fully and fairly litigated through two hearings in another United States District Court, involving precisely the same parties, the government is estopped from contesting the legality of the search. The government concedes that there is some merit to Armstrong's position, noting that while there does not appear to be any decision directly on point, courts addressing similar, perhaps even indistinguishable, issues have held collateral estoppel applies. *See United States v. Levasseur,* 699 F.Supp. 965, 981 (D.Mass.), *rev'd in part on other grounds,* 846 F.2d 786 (1st Cir.1988) (defendant collaterally estopped from relitigating in a second United States District Court an unsuccessful motion to suppress). There is indeed no sound reason for denying collateral estoppel effect to the fully litigated decision of another United States District Court involving the same parties and the same issues. *See id.*

4. *See United States v. Mitchell,* 45 F.3d 428, 1994 WL 717605 at \*\*2 (4th Cir.1994) (unpublished disposition) ("The exclusionary rule applies at a proceeding to revoke a defendant's supervised release.") (citing *Workman* ). Unpublished opinions are not binding precedent in this circuit.

*See Hogan v. Carter,* 85 F.3d 1113, 1118 (4th Cir.1996) ("Under our own internal rules, unpublished opinions are not precedential ..."); *see also* 4th Cir. Local Rule 36(c). Thus, such opinions are generally entitled only to the weight generated by the persuasiveness of their reasoning. *See Hupman v. Cook,* 640 F.2d 497, 501 n. 7 (4th Cir.1981). In *Mitchell,* no reasoning, other than citation to *Workman,* was offered.

5. The Fourth Circuit found that because a probation revocation hearing is an adjudicative criminal proceeding that may result in the loss of liberty, and is frequently used as an alternative to trial on the new charges, the potential for both injury and benefit is roughly the same as in other criminal proceedings. *See Workman,* 585 F.2d at 1209–10. Thus, the *Workman* court required a comparison to Supreme Court precedent to obtain an "objective appraisal of the rule's deterrent effect in revocation proceedings by considering the Supreme Court's assessment of that effect in other contexts." *See id.* at 1210.

6. It also noted that a probationer usually has not or will not have the opportunity to seek exclusion at some other stage in the proceeding or in some other proceeding, unlike a petitioner for writ of habeas corpus or a person seeking exclusion at the grand jury stage. *See id.*

Since *Workman,* the Supreme Court has addressed the role of the exclusionary rule in several cases, and limited its applicability, even in the context of criminal proceedings.[7] Thus, the Supreme Court, subsequent to *Workman,* has held that the exclusionary rule (i) does not apply in deportation hearings,[8] (ii) does not apply when a police officer reasonably relied on a search warrant that was later deemed invalid,[9] and (iii) does not apply when a police officer reasonably relied on a statute later deemed unconstitutional.[10] Indeed, so much had the exclusionary rule landscape changed by 1989, that a district judge in this circuit adopted the memorandum and recommendation of a magistrate judge, which held that the exclusionary rule does not apply to parole revocation proceedings because "developments since 1978 have worked a substantial change in the judicial view of the exclusionary rule." *See Pratt v. United States Parole Commission,* 717 F.Supp. 382, 385 (E.D.N.C.1989).[11]

Nor is this the end of the story; the most recent Supreme Court decision on the application of the exclusionary rule in collateral proceedings powerfully confirms the view expressed in *Pratt. Pennsylvania Board of Probation and Parole v. Scott* holds that the exclusionary rule does not apply in state parole revocation proceedings, which are closely analogous to the federal probation revocation hearing at issue in *Workman.* It follows inescapably from *Workman's* teachings that the Fourth Circuit panel in *Workman,* under its own analysis, would reach a different result today in light of *Scott.* Thus, *Workman's* conclusion that the exclusionary

rule applies in probation revocation hearings can no longer be considered authoritative circuit precedent.

A review of the analysis conducted by the *Scott* court supports this conclusion. In *Scott,* the Supreme Court began its analysis by emphasizing (i) that the government's use of illegally seized evidence does not itself violate the Constitution, (ii) that the exclusionary rule is "a judicially created means of deterring illegal searches and seizures," and (iii) that the exclusionary rule is only to be applied where the deterrence benefits outweigh the " 'substantial social costs.' " *See* 524 U.S. at ——, 118 S.Ct. at 2019 (quoting *United States v. Leon,* 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). Noting that in prior decisions it has "repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials," and has "significantly limited" its application even in criminal trials, the Supreme Court stated that "the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." *See id.* at 2019–20 & 2020 n. 4 (citing *United States v. Payner,* 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980)).

Examining the application of the exclusionary rule to state parole proceedings in light of these principles, the Supreme Court began by finding that the costs of excluding reliable, probative evidence are particularly high in parole revocation proceedings. *See id.* at 2020.[12] Further, the "traditionally flexible,

7. *See Scott,* 118 S.Ct. at 2020 n. 4 (summarizing cases).

8. *See INS v. Lopez–Mendoza,* 468 U.S. 1032, 1050, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (plurality opinion).

9. *See United States v. Leon,* 468 U.S. 897, 920–22, 104 S.Ct. 3405 (1984).

10. *See Illinois v. Krull,* 480 U.S. 340, 349–50, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987).

11. The magistrate judge also relied on Supreme Court precedent limiting Constitutional protections in the "supervised, conditional liberty" context. *See Pratt,* 717 F.Supp. at 386; *see also Minnesota v. Murphy,* 465 U.S. 420, 435, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (probationer

statements to probation officer without *Miranda* warnings admissible in criminal proceedings); *Griffin v. Wisconsin,* 483 U.S. 868, 880, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (warrantless search of probationer's residence based on less than probable cause reasonable under Fourth Amendment because conducted pursuant to valid probation regulation).

12. The costs are particularly high because (i) parole, a variation on imprisonment, allows the State to offer limited freedom only because it can condition that freedom on compliance with certain requirements, and excluding evidence hampers the state's ability to ensure compliance and (ii) the costs of allowing noncompliance are higher because parolees are more likely to commit future criminal offenses than average citizens. *See Scott,* 118 S.Ct. at 2020.

administrative procedures" of parole revocation are not compatible with the exclusionary rule,[13] and application of the exclusionary rule would alter the parole process, requiring extensive litigation to determine whether to exclude particular evidence and altering the nonadversarial nature of the administrative processes established by the States. *See id.* at 2020–21.[14] The Supreme Court also held that the deterrence benefits do not outweigh the costs in this context; the application of the exclusionary rule would have little deterrent effect upon an officer who is unaware of the parolee's status, and the possibility that illegally seized evidence will be suppressed in a trial for the crime at issue as opposed to the original arrest provides adequate deterrence. *See id.* at 2021–22.[15] The Supreme Court concluded that it has "long been averse to imposing federal requirements upon the parole systems of the States," and thus "[t]he marginal deterrence of unreasonable searches and seizures is insufficient to justify such an intrusion." *See id.* at 2022.

*Scott* does not directly address federal supervised release revocation hearings, and indeed referred to federalism concerns that do not arise in the context of federal supervised release hearings. Even so, the Supreme Court's analysis in *Scott* is applicable to revocation of supervised release hearings. Thus, in the context of revocation of supervised release hearings, as in the context of parole hearings, the "high obstacle" for application of the exclusionary rule is not met. First, the costs at issue here are identical to those found "particularly high" by the Supreme Court in *Scott.* Like a parolee, a convicted criminal on supervised release is conditionally released precisely because the person's freedom can be conditioned on compliance with certain requirements; application of the exclusionary rule in the supervised release context would hamper the government's ability to ensure that compliance just as significantly in the supervised release context. Moreover, the Supreme Court's assumption that probationers are more likely to commit future criminal offenses than average citizens is applicable with equal force to convicted criminals on supervised release.[16] That the costs of applying the exclusionary rule in both contexts are essentially identical is unsurprising, given the similarity of purposes of parole, probation, and supervised release. Indeed, courts have generally treated these contexts, and decisions within these context, as interchangeably applicable.[17]

**13.** In this regard, the Supreme Court noted that, among other things, parolees are not entitled to all the due process rights to which a criminal defendant is entitled. *See id.* at 2021 n. 5.

**14.** The Supreme Court also noted that this alteration could be detrimental to the parolee because (i) it would change the nature of the proceedings from a focus on best interests of the State and the defendant to an adversarial proceeding and (ii) the financial incentive to offer parole in the first place could be reduced if the costs of litigating violations is increased. *See id.* at 2021.

**15.** The Supreme Court declined to adopt the Pennsylvania Supreme Court's approach of a special rule for those situations in which the officer performing the search knows that the subject of the search is a parolee. In this regard, the Supreme Court noted (i) that it has never suggested "that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence," (ii) that a piecemeal approach would add an additional layer of collateral litigation regarding the officer's knowledge of the parolee's status and (iii) that the additional deterrence of such a rule would be minimal because first, officers generally focus on obtaining convictions of those who commit crimes, not

ensuring compliance with parole conditions, and second, parole officers, who focus more on compliance, have a supervisory role different from the adversarial role of police officers. *See id.* at 2022.

**16.** *See Griffin v. Wisconsin,* 483 U.S. 868, 880, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) ("[I]t is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law.").

**17.** Thus, in stating that parolees are more likely than the ordinary citizen to commit future crimes, Justice Thomas applied the analysis of a case from the probation context, not the parole context. *See Scott,* 118 S.Ct. at 2020. This is entirely consistent with the generally interchangeable way courts have treated and applied parole, probation and supervised release decisions. *See, e.g., United States v. Mitchell,* 45 F.3d 428, 1994 WL 717605, **2 (4th Cir.1994) (applying *Workman* probation hearing decision to supervised release case without discussion); *see also United States v. Gravina,* 906 F.Supp. 50, 53 n. 1 (D.Mass.1995) ("As the standards and interests involved are essentially the same in the parole, probation, and supervised release revoca-

To be sure, federal supervised release hearings are not identical to state parole hearings in all respects, and the federalism concerns implicit in the Supreme Court's discussion in *Scott* are not at issue in federal supervised release hearings. Yet in one important respect, hearings in these three contexts—parole, probation and supervised release—are virtually identical. In all three contexts, courts have "wide[r] latitude under the Constitution" than in the context of a criminal trial.[18] Thus, the standard born by the government at a supervised release revocation hearing is the preponderance of the evidence standard, not the beyond a reasonable doubt standard,[19] and "the traditional rules of evidence do not apply."[20] Moreover, the Supreme Court's analysis of the minimal deterrent effect of the application of the exclusionary rule in the context of revocation of parole hearings is also equally applicable to revocation of supervised release hearings, *i.e.*, deterrence here would be minimal.[21]

The applicability of the *Scott* analysis to supervised release revocation hearings highlights the common sense underlying the Fourth Circuit's approach in *Workman*, namely that as is true here, essentially similar contexts should result in essentially similar cost-benefit analysis, leading to similar conclusions as to the applicability of the exclusionary rule. Thus, the Fourth Circuit's instruction in *Workman* to compare revocation hearings "with other instances where the Supreme Court has considered the rule's application" leads inevitably to the conclusion that the *Workman* court would reach a contrary result in light of the Supreme Court decisions handed down in the intervening 20 years since *Workman* was decided. Accordingly, the exclusionary rule does not apply to prohibit the use of the evidence suppressed in the District of Columbia action in the context of the petition for revocation of Armstrong's supervised release.

Of course, district courts should be loath to reach a decision contrary to controlling circuit authority.[22] Only in the rarest cases should district courts respectfully decline to follow controlling circuit precedent. This is such a rare case. It falls into this category because the existing circuit precedent—*Workman*—teaches a specific analysis that is tied to Supreme Court precedent. In other words, the Fourth Circuit panel in *Workman* reached a result based on the then current state of analogous Supreme Court precedent on the exclusionary rule that existed at the time. The exclusionary rule landscape has changed strikingly since then, and it is no longer reasonable to conclude that the *Workman* panel would reach the same result given the subsequent developments in Supreme Court precedent. Accordingly, this is one of those rare cases where controlling precedent, by its own terms, forecasts the

tion contexts, the reasoning underlying cases concerning the admissibility of evidence in one type of hearing are applicable to the other two as well.").

**18.** *See Scott*, 118 S.Ct. at 2021 n. 5; *United States v. Woodrup*, 86 F.3d 359, 361 (4th Cir. 1996) ("That the sentence imposed upon revocation of supervision is punishment for the original offense is further confirmed by the fact that the full panoply of constitutional protections afforded a criminal defendant is not required for the revocation of supervised release.").

**19.** *See Woodrup*, 86 F.3d at 361 (citing 18 U.S.C. § 3583(e)).

**20.** *See Scott*, 118 S.Ct. at 2021; *United States v. Goodson*, 7 F.3d 227, 1993 WL 393367 (4th Cir. 1993) (unpublished disposition) ("Because supervised release revocation proceedings and probation revocation proceedings have the same constitutional requirements, the Federal Rules of Evidence are inapplicable to supervised release revocation hearings").

**21.** Indeed, this case presents one of the clearest scenarios of the minimal nature of the additional deterrent effect. Here, the primary deterrent effect of the exclusionary rule has already been felt in that its application in the District of Columbia proceeding prevented Armstrong's prosecution for his conduct in that District. Counsel agree that Armstrong would have faced a 15 year sentence had he been convicted in the District of Columbia, but faces a recommended Guidelines range *sentence of 27 to 33 months and a statutory maximum of five years*. Moreover, there is no evidence in the record to suggest that the police officers were aware of Armstrong's supervised release status at the time of his arrest; thus, the possibility that the evidence would be suppressed in a revocation of release hearing could not have affected their conduct during the arrest.

**22.** *See Pratt*, 717 F.Supp. at 384 ("Obviously, I am loath to reach any decision contrary to controlling circuit authority …").

possibility that the result reached there might have to change in light of changing Supreme Court precedent.

## III.

The conclusion as to the exclusionary rule is not dispositive of the petition. Still unresolved is the question whether Armstrong possessed the contraband seized from the car. The record plainly shows (i) that Armstrong was the owner of the car, (ii) that he was driving the car when he was stopped by the police, (iii) that the gun was under the floormat on the driver's side of the car, but was not in plain view,[23] and (iv) that the crack cocaine was located in a change drawer to the left of the steering wheel. Armstrong denies ownership of the gun, and contends that the government has not proven that he possessed the gun; the government contends that these facts, under the doctrine of constructive possession, are more than sufficient to prove that defendant possessed the gun.

 Constructive possession may be shown by direct or circumstantial evidence. *United States v. Laughman*, 618 F.2d 1067, 1077 (4th Cir.1980). To establish constructive possession, the government must produce evidence showing ownership, dominion, or control over the contraband itself or the premise or the vehicle in which the contraband is concealed. *See United States v. Blue*, 957 F.2d 106, 107 (4th Cir.1992). Armstrong relies chiefly on *Blue*. In *Blue*, the Fourth Circuit found that constructive possession had not been established. Yet, *Blue* is factually distinguishable,[24] as the only facts to support the finding of constructive possession were (i) that Blue, a passenger in the car, dipped his shoulder as the officer approached the car, and (ii) the gun was located under the passenger seat.[25] In finding these facts insufficient, the Fourth Circuit noted that Blue was not the owner of the car, and that no evidence suggested that Blue had ever been in the car prior to the date of his arrest. *See id.* at 107.[26] The parties have not cited a case involving precisely the facts presented here. Nonetheless, under these facts, it is more likely than not true that Armstrong, the owner and driver of the car at the time, exercised ownership, dominion and control over the vehicle in which the contraband was found. Moreover the location of the gun, given its size and bulk, further supports the finding of constructive possession.

## IV.

For the reasons stated from the bench, the Court finds that a violation of the terms and the conditions of defendant Armstrong's supervised release has occurred, revokes defendant's supervised release pursuant to 18 U.S.C. § 3582, and imposes a sentence of 27 months, with credit for seven months time served in connection with this violation. The Court stays this sentence, pursuant to Rule 9(c), F.R.A.P., and 18 U.S.C. § 3143(b), pending defendant's appeal.

---

23. This finding was necessary and material to the conclusion reached by the United States District Court for the District of Columbia in deciding the motion to suppress and is entitled to collateral estoppel effect.

24. *Blue* involved a conviction after an arrest; thus, the applicable legal standard is also distinguishable.

25. The court in *Blue* found that "the facts of this case fall outside, but just barely, the realm of the quantum of evidence necessary to support a finding of constructive possession." *Blue*, 957 F.2d at 108.

26. *See also United States v. Wilkerson*, 81 F.3d 152, 1996 WL 148554 (4th Cir.1996) (unpublished disposition) ("*Blue* stands only for the propositions that mere accessibility does not prove constructive possession and that a shoulder dip alone does not transform a person from a mere passenger in the car to a possessor of whatever is discovered underneath the seat in which he is sitting.").