MARKMAN, J.
(concurring). I concur with the majority in its adoption of the good-faith exception to the exclusionary rule, an exception recognized by the United States Supreme Court. I write separately only in order to respond more fully to the dissent.
Among myriad other shortcomings, the dissent accuses the majority of “fail[ing] to resist the lure of expediency,” “forsak[ing] its commitment to our citizens,” “ discarding] decades of sound analysis,” “contracting] citizen protections,” and “treating] our Constitution as an impediment.[1],[1] Post at 558, 560, 561, 564. It must be understood that this overwrought language stands in support of the following proposition, which is found nowhere in either the Michigan Constitution or the United States Constitution, to wit, no matter how much good faith is demonstrated by the police in the *545 conduct of a criminal investigation, no matter how slight an imperfection in such investigation,[2] no matter how serious the crime under investigation, and no matter how indispensable the evidence obtained during the investigation in determining the truth of who perpetrated a crime, the prosecutor, in carrying out his responsibilities on behalf of the people of Michigan, must proceed to trial without that evidence. That is, the prosecutor must proceed to trial (if that is even possible after evidence has been excluded) as though the dead body in the basement did not exist, as though the illegal firearm under the sofa was never really there, and as though the incendiary materials in the garage were merely a figment of one’s imagination, in the process requiring that a jury of defendant’s peers—a jury comprised of twelve citizens brought together for the sole purpose of exercising their judgment and common sense in order to determine the truth of a criminal charge—render an accurate and just verdict while being deprived of what may well be the most relevant available evidence.
In urging such a justice system, the dissent also gives little consideration to the effect that decision-making by a blindfolded jury has upon public confidence in the integrity of a process viewed by the people, correctly, as indispensable in carrying out the first responsibility of government—the maintenance of what the Constitution of the United States describes as “domestic tranquility.” The dissent’s denunciation of the majority is in defense of a justice system in which more juries will be *546 deprived of more evidence, and, therefore, in which more juries will render more verdicts in which guilt or innocence is determined inaccurately. The dissent’s denunciation is also in defense of a system in which more citizens serving on more juries will perform their civic obligation only to learn afterward, for the first time, that they have been deprived of access to facts and evidence that might have been determinative in their decisions. The attitude of these jurors, as well as the attitude of victims, witnesses, and the public, toward a system of justice in which the government’s ability to carry out its responsibility of protecting the people from criminals is compromised by such a cavalier attitude toward evidence can only be imagined.
While the exclusion of evidence may, under exceptional circumstances, be constitutionally compelled, where it is not compelled—as the United States Supreme Court has determined to be the case where the police have carried out their responsibilities in good faith—it is hardly self-evident why the people of our State would wish to have more, rather than fewer, critical decisions of guilt or innocence decided by jurors who each has one of his hands tied behind his back. Evidence is the lifeblood of the criminal justice process, and it is indispensable in ensuring fair and just determinations.
Concerning what furthers “citizen protections” under our Constitution, the dissent’s dismissive conclusion that Michigan has “managed to exist for decades with the exclusionary rule and our streets have yet to become teeming with criminals released on ‘technicalities,’ ” post at 568, belies that there is a real, but uncertain, number of criminals on our streets who have gone either unprosecuted, prosecuted on lesser charges, or unconvicted, because evidence has been withheld *547 from a jury. That is an undeniable and logical reality of an exclusionary rule that pertains even to good-faith errors on the part of the police. While perhaps the extent to which our streets are or are not “teeming” with criminals who would have been incarcerated but for the absence of a good-faith exception cannot be precisely calculated, rates of violent crime have, in fact, grown enormously over recent decades.[3] Had our parents and grandparents, at the time of the inception of an exclusionary rule in Michigan lacking a good-faith exception, been able to look into their future and compared levels of violent crime then and now, it is quite certain that they would have viewed many of our streets today as “teeming” with crime. Doubtlessly, however, the people of Michigan will continue to “manage to exist” at whatever levels of crime are contributed to by individual criminal justice decisions of the courts.[4]
*548 Despite the hyperbolic rhetoric of the dissent, the rights of criminal defendants have remained well-protected, both in the federal system and in those growing numbers of states in which the good-faith exception to the exclusionary rule has been adopted.[5] On the other hand, the rights of everyone else, and of society generally, have been better protected because the criminal justice system has been allowed to assess a defendant’s guilt or innocence on the basis of the full range of relevant evidence. And, as a result, in some unknown, but very real, number of cases, criminal defendants, who, under the dissent’s approach, would have been left on the streets to continue to prey upon their communities, have been convicted of serious crimes on the basis of trustworthy evidence and after full due process of law.
The dissent asserts that it is “unclear how an allegedly increasing crime rate is relevant in determining our citizens’ constitutional rights.. . .” Post at *549 568. That is, of course, neither my position nor that of the majority. Increasing crime rates have been cited only in response to the dissent’s suggestions that there are no adverse consequences to its position and that Michigan has “managed to exist” despite the absence of a good-faith exception. More accurately, my position is that the absolutist exclusionary rule of the dissent’s constitution, has little to do with the exclusionary rule of the constitutions that actually prevail in the United States and Michigan.
The dissent seems agitated that this concurrence would invoke such considerations as the impact of the dissent’s rule upon crime, the absence of deterrent effect of the dissent’s rule on police misconduct, and the adverse impact of the dissent’s rule upon the integrity of the justice system. These considerations allegedly are in contrast to the dissent’s more focused concern about the Constitution. The problem with this analysis is that the dissent’s constitution is not that of James Madison,[6] not that of the United States Supreme Court, and not that ratified by the people of Michigan. Rather, the *550 United States Supreme Court has made clear that the exclusionary rule is of “quasi-constitutional” dimension and that its applicability in particular contexts is a function of a variety of pragmatic and balancing considerations.[7] While the dissent is entitled to its view that the rule should be applied more broadly, and contain fewer exceptions, the dissent should not confuse its own views with those of either the United States Constitution or the Michigan Constitution.
Among other limitations on the exclusionary rule, the United States Supreme Court has concluded that the rule does not apply retroactively unlike most rules that are constitutional, Linkletter v Walker, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965); the rule does not apply to those lacking standing, Alderman v United States, 394 US 165; 89 S Ct 961; 22 L Ed 2d 176 (1969); the rule does not apply to grand jury proceedings, United States v Calandra, 414 US 338; 94 S Ct 613; 38 L Ed 2d 561 (1974); the rule does not apply to civil proceedings, United States v Janis, 428 US 433; 96 S Ct 3021; 49 L Ed 2d 1046 (1976); the rule does not apply to deportation proceedings, Immigration & Naturalization Service v Lopez-Mendoza, 468 US 1032; 104 S Ct 3479; 82 L Ed 2d 778 (1984); the rule does not apply where the unlawfully seized evidence is used against a parolee in parole revocation hearings, Pennsylvania Bd of Probation v Scott, 524 US 357; 118 S Ct 2014; 141 L Ed 2d 344 (1998); the rule does not apply where evidence is used to impeach a defendant in a criminal *551 proceeding, James v Illinois, 493 US 307; 110 S Ct 648; 107 L Ed 2d 676 (1990); the rule does not apply in the context of habeas corpus relief where the state has provided an opportunity for full and fair litigation of the Fourth Amendment claim, Stone v Powell, 428 US 465; 96 S Ct 3037; 49 L Ed 2d 1067 (1976); the rule does not apply where the police have acted in objectively reasonable reliance upon a statute that is subsequently declared unconstitutional, Illinois v Krull, 480 US 340; 107 S Ct 1160; 94 L Ed 2d 364 (1987); the rule does not apply if the government can be said to have also discovered the evidence through independent means, Silverthorne Lumber Co v United States, 251 US 385; 40 S Ct 182; 64 L Ed 319 (1920); the rule does not apply if the connection between the illegality and the seizure has become so attenuated as to dissipate the taint, Nardone v United States, 308 US 338; 60 S Ct 266; 84 L Ed 307 (1939); the rule does not apply where the evidence would at some future time likely have been discovered, Nix v Williams, 467 US 431; 104 S Ct 2501; 81 L Ed 2d 377 (1984); the rule does not apply where the police have in good faith relied upon a defective warrant, United States v Leon, 468 US 897; 104 S Ct 3405; 82 L Ed 2d 677 (1984); Massachusetts v Sheppard, 468 US 981; 104 S Ct 3424; 82 L Ed 2d 737 (1984); and the rule does apply, even with respect to substantial and deliberate violations of the Fourth Amendment, only “in the absence of a more efficacious sanction... Franks v Delaware, 438 US 154; 98 S Ct 2674; 57 L Ed 2d 667 (1978).
“Neither [these] cases nor any others hold that anything which deters illegal searches is thereby commanded by the Fourth Amendment. The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evi *552 dence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.” Alderman, supra at 174-175.
“Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.” Calandra, supra at 348.
“In deciding whether to extend the exclusionary rule to grand jury proceedings, we must weigh the potential injury to the historic role and functions of the grand jury against the potential benefits of the rule as applied in this context. It is evident that this extension of the exclusionary rule would seriously impede the grand jury.” Id. at 349.
“Against this potential damage to the role and functions of the grand jury, we must weigh the benefits to be derived from this proposed extension of the exclusionary rule. Suppression of the use of illegally seized evidence against the search victim in a criminal trial is thought to be an important method of effectuating the Fourth Amendment. But it does not follow that the Fourth Amendment requires adoption of every proposal that might deter police misconduct.” Id. at 350.
“ ‘Illegal conduct’ is hardly sanctioned, nor are the foundations of the Republic imperiled, by declining to make an unprecedented extension of the exclusionary *553 rale to grand jury proceedings where the rule’s objectives would not be effectively served and where other important and historic values would be unduly prejudiced.” Id. at 355 n 11.
“[W]e conclude that exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion. This Court, therefore, is not justified in so extending the exclusionary rale.” Janis, supra at 454.
“ ‘[It] will not do to forget that the [Weeks] rule is a rule arrived at only on the nicest balance of competing considerations and in view of the necessity of finding some effective judicial sanction to preserve the Constitution’s search and seizure guarantees. The rule is unsupportable as reparation or compensatory dispensation to the injured criminal; its sole rational justification is the experience of its indispensability in “[exerting] general legal pressures to secure obedience to the Fourth Amendment on the part of federal law-enforcing officers.” As it serves this function, the rule is a needed, but [grudgingly] taken, medicament; no more should be swallowed than is needed to combat the disease. Granted that so many criminals must go free as will deter the constables from blundering, pursuance of this policy of liberation beyond the confines of necessity inflicts gratuitous harm on the public interest as declared by Congress.’ Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U. Pa. L. Rev. 378, 388-389 (1964).” Janis, supra at 454 n 29.
' “[T]he policies behind the exclusionary rule are not absolute. Rather, they must be evaluated in light of competing policies.” Stone, supra at 488.
“The answer is to be found by weighing the utility of the exclusionary rule against the costs of extending it to *554 collateral review of Fourth Amendment claims.” Id. at 489.
“[T]he contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal and the substantial societal costs of application of the rule persist with special force.” Id. at 494-495.
“In these circumstances we are persuaded that the Janis balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings held by the INS.” Lopez-Mendoza, supra at 1050.
“As with any remedial device, application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced. Thus, in various circumstances, the Court has examined whether the rule’s deterrent effect will be achieved, and has weighed the likelihood of such deterrence against the costs of withholding rehable information from the truth-seeking process.” Krull, supra at 347.
“[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the ‘substantial social costs exacted by the exclusionary rule.’ When we indulge in such weighing, we are convinced that applying the exclusionary rule in this context is unjustified.” Id. at 352-353 (citation omitted).
“[Bjecause the rule is prudential rather than constitutionally mandated, we have held it to be applicable only where its deterrence benefits outweigh its ‘substantial social costs.’ ” Pennsylvania Bd of Probation, supra at 363.[8]
*555 It is for these reasons that there are a variety of considerations—extending far beyond those that the dissent would assess—that are fully relevant in determining whether the exclusionary rule is applicable in a particular instance, and that explain why the rule is not as broad or as absolute as the dissent would prefer.
Further, it must be recognized—and the majority opinion addresses this point, see ante at 535 n 8—that as far back as 1936, the Michigan Constitution exempted from the exclusionary rule “any narcotic drug or drugs, any firearm, rifle, pistol, revolver, automatic pistol, machine gun, bomb, bomb shell, explosive, blackjack, slingshot, billy, metallic knuckles, gas-ejecting device, or any other dangerous weapon or thing, seized by any peace officer outside the curtilage of any dwelling house in this state.”[9] That is, the Michigan Constitution from 1936 until 1961, when Mapp v Ohio, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), introduced a uniform national rule, imposed a limitation on the exclusionary rule that was considerably more restrictive than its federal counterpart. See, e.g., People v Gonzales, 356 Mich 247; 97 NW2d 16 (1959); People v Winkle, 358 Mich 551, 556; 100 NW2d 309 (I960).[10] *556 Moreover, this relationship was sought to be continued by the 1963 constitution in which, two years after Mapp, its drafters again limited the reach of the exclusionary rule by inserting language substantially similar to that of Const 1908, art 2, § 10 (exempting from the exclusionary rule “any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state”).
Thus, while the dissent cites the alleged “eighty year” period during which the exclusionary rule that it favors existed in unadulterated form in Michigan, post at 568, in truth the “heyday” of the exclusionary rule that the dissent recalls did not exist for at least a quarter-century preceding Mapp—because Michigan had substantially limited the scope of the rule in precisely those areas of criminal law in which it tends to be most regularly invoked—and it did not exist for many years afterward because the United States Supreme Court quickly made clear that the exclusionary rule was merely a judicially created, “prophylactic” remedy rather than a rule of absolute and invariable constitutional dimension.[11]
*557 The dissent purports to create a constitutional regime in Michigan in which it is able to pick and choose from among what it views as the “best” rules of particular eras, and combine them to create a constitutional regime that has existed in the real world for only brief moments. The dissent would combine an exclusionary rule that is broad in its coverage, failing to exclude “narcotic drugs, firearms, bombs, explosives [and] any other dangerous weapons,” with an exclusionary rule that is narrow in its exceptions, most importantly lacking a good-faith exception. It is seriously misleading for the dissent to suggest that its position is a legitimate heir to “eighty years” of constitutional understanding in our state.
In summary, the dissent’s constitution is one that would be unrecognizable to the framers of the United States Constitution or the Michigan Constitution, as well as to generations of justices of both the United States Supreme Court and the Michigan Supreme Court. The dissent’s constitution is one that ill-serves the interests of a responsible criminal justice system.[12] Given its lack of deterrent effect, the only consequence *558 of the dissent’s absolute exclusionary rule would be to raise an extraordinarily costly obstacle in the way of effective law enforcement.

 Further, the dissent characterizes this concurring opinion as a “diatribe,”post at 568; as an “hystericalü” argument,post at 568; and as somehow predicated upon its own “divine notion” of the Constitution’s meaning. Post at 571. What all the dissent’s unrestrained language cannot obscure, however, is that it offers little in the way of response to the principal arguments set forth in the majority and concurring opinions: (1) an exclusionary rule without a good-faith exception is not mandated by either the United States Constitution or the Michigan Constitution; (2) the costs of an exclusionary rule without a good-faith exception are enormously high, while the benefits are virtually nonexistent; and (3) the exclusionary rule that has existed in the United States and in Michigan, unlike that preferred by the dissent, has always taken into consideration a balancing of costs and benefits.
One doubtlessly would search in vain over the past twenty-two years for similar language from other dissenting justices of this Court whose opposition to my dissenting colleague’s criminal justice decisions, and whose opposition to the direction in which his decisions took this Court and the Michigan Constitution for many years, was no less deeply felt than that of my dissenting colleague.

 While the dissent asserts that the imperfection in this case is not slight, in truth, it is not relevant to the dissent whether it is slight or not because, under the dissent’s view, whatever the magnitude of the imperfection, the evidence must he excluded.

 The dissent is, of course, correct that crime rates do not uniformly proceed upward or downward. Post at 568 n 9. This point notwithstanding, violent crime rates in the United States, and in Michigan specifically, are far higher today than they were forty years ago. This can be confirmed by a cursory analysis of Bureau of Justice Statistics or FBI Uniform Crime figures. According to the latter, murder rates have grown by approximately 90%, forcible rape rates by 237%, aggravated assault rates by 240%, and overall violent crime rates by 144%. <http:// www.disastercenter.com/crime/micrime.htm> (accessed July 9, 2004).

 The dissent finds this discussion to be “hystericalQ,” post at 568. The dissent apparently wishes to have its cake and eat it as well, i.e., being allowed to criticize the majority for the damage that it allegedly is doing to the cause of constitutional government, while being immune itself from criticism for the consequences of its own position. If, from the perspective of the dissent, the cost of the majority position is the loss of constitutional protections, from the perspective of the majority, the cost of the dissent’s position is that, absent any constitutional imperative and absent any conceivable impact in deterring unconstitutional searches or seizures, the dissent’s position would result in more violent offenders populating our streets. Certainly, this is not a consequence that is intended or desired by the dissenting justices, but it nonetheless would be the inevitable consequence of their position. There is no free lunch for the *548 dissent. It is entitled to argue its positions, but it is no more immune than the majority from accountability and responsibility for these positions. Further, it should be understood that the dissent does not dispute what this opinion asserts about the practical consequences of its far-reaching exclusionary rule; it merely responds that such assertions are “hysterical!;].”

 Moreover, the rule advanced by the dissent, i.e., an exclusionary rule without a good-faith exception, by definition, could have no effect in deterring even a single improper search; all that this rule could do would be to afford a serendipitous windfall to an occasional guilty party by enabling such person to exclude rehable, inculpatory evidence from trial. “[A]ny rule of evidence that denies the jury access to clearly probative and rehable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official lawlessness.” Illinois v Gates, 462 US 213, 257-258; 103 S Ct 2317; 76 L Ed 2d 527 (1983) (White J., concurring). The hard-to-understand calculus of the dissent’s approach would be to deny the jury access to clearly probative and rehable evidence without any apparent countervailing benefit in deterring official lawlessness.

 That the dissent’s rule is not part of James Madison’s Constitution is manifest by the absence of any mention in the Constitution of such a rule as well as by consistent early judicial practice. As summarized by one scholar:
[Slearches of private premises generally required warrants. In all other circumstances, warrants were unnecessary. Any person, including a private citizen, acting on his own, could search and seize at his own peril. If the search uncovered contraband or property otherwise subject to forfeiture, then he was completely justified. If, however, the search proved fruitless, then the party who made the search was hable to damages unless he could find the shelter of a statute. A search conducted in good faith pursuant to statutory authority was considered reasonable. [Harris, Back to basics: An examination of the exclusionary rule, 37 Ark L R 646, 647 (1983).]
See also Gelston v Hoyt, 16 US 246; 4 L Ed 381 (1818); Wood v United States, 41 US 342; 10 L Ed 987 (1842).

 While, from the dissent’s perspective, the majority’s approach to interpreting the breadth of the exclusionary rule may seem “distinctive” or “idiosyncratic,”post at 568 n 9, it is essentially indistinguishable from that of the United States Supreme Court in view of that Court’s characterization of the rule as a uniquely “judicially created” remedy. Pennsylvania Bd of Probation v Scott, 524 US 357, 363; 118 S Ct 2014; 141 L Ed 2d 344 (1998).

 “The history of Const 1963, art 1, § 11, and its plain import, however, suggest that its further expansion, with the concomitant expansion of the *555 exclusionary rule to enforce it, should occur only when there is a compelling reason to do so.” People v Nash, 418 Mich 196, 214; 341 NW2d 439 (1983).

 In 1936, the people ratified an amendment of Const 1908, art 2, § 10, which added the above language, now known as the anti-exclusionary clause.

 See also People v Winterheld, 359 Mich 467; 102 NW2d 201 (1960), which held that the exclusionary rule in Michigan does not preclude application of the so-called “silver platter” doctrine in which evidence, unlawfully seized in a foreign jurisdiction, can be utilized by Michigan police officers. “With respect to acts beyond its borders, by officers of another State, such guarantees do not extend to them and, hence, the reason for the rule in that regard disappears and, with it, the rule.” Id. at 471 (emphasis added).

 See Calandra, supra at 348. It has consistently been the constitutional law of Michigan that the “search and seizure provision of the Michigan Constitution, Const 1963, art 1, § 11, affords defendant no greater rights upon which to support the suppression than the Fourth Amendment.” People v Chapman, 425 Mich 245, 252-253; 387 NW2d 835 (1986). “[A]rt 1, § 11 is to be construed to provide the same protection as that secured by the Fourth Amendment, absent ‘compelling reason’ to impose a different interpretation.” People v Collins, 438 Mich 8, 25; 475 NW2d 684 (1991). “[T]he historical record clearly indicates that the people of Michigan had no intention of imposing more stringent restrictions upon law enforcement than is mandated by the Fourth Amendment.” Id. at 32-33. “There is no compelling reason to interpret Const 1963, art 1, § 11 as affording greater protection for this defendant than is provided under the Fourth Amendment.” Id. at 40. It is the dissent, not the majority, that is “ignor[ing] Michigan’s history,” post at 558, in *557 failing to consider this statement of the traditional relationship between the Fourth Amendment of the United States Constitution and art 1, § 11 of the Michigan Constitution.

 Contrary to the dissent’s intimations, the majority is not unconcerned about even good-faith imperfections in the investigative process. However, the issue before this Court is only whether suppression of the evidence is an appropriate remedy for a good-faith violation. There are far more appropriate and finely tuned remedies for violations of this kind, such as civil damages or tort claim remedies against the government. One of the virtues of enacting such alternative remedies is that they would compensate not only persons with respect to whom evidence of a crime has been discovered, but also those with respect to whom no such evidence has been discovered hut who have nonetheless been the victims of Fourth Amendment violations. By contrast, the exclusionary rule accords benefit only to those with respect to whom evidence of a crime has been discovered.